162 F.3d 463
 PLANNED PARENTHOOD OF WISCONSIN, et al., Plaintiffs-Appellants,
v.
James E. DOYLE, in his official capacity as Attorney General
of the State of Wisconsin, and Diana M. Nicks, in her
official capacity as District Attorney for Dane County and
as a representative of a class consisting of all district
attorneys in the State of Wisconsin, Defendants-Appellees,
and
Thomas J. Back and Fredric K. Buford, II, Intervening
Defendants-Appellees.
 No. 98-2521.
 United States Court of Appeals,
Seventh Circuit.
 Argued Aug. 10, 1998.
Decided Nov. 3, 1998.
 
 Bonnie Scott Jones, Center for Reproductive Law & Policy, New York City; Roger K. Evans (argued), Planned Parenthood Federation of America, Legal Action for Reproductive Rights, New York City, for Plaintiffs-Appellants.
 Susan K. Ullman (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants-Appellees.
 James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN; Scott D. Obernberger, Milwaukee, WI, for Intervening Defendants-Appellees
 Before POSNER, Chief Judge, and MANION and ROVNER, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This is an appeal from the denial (reported at 9 F.Supp.2d 1033 (W.D.Wis.1998)) of a motion for a preliminary injunction against the enforcement of a recently enacted Wisconsin statute that decrees life imprisonment for anyone who performs a "partial birth abortion." Wis. Stat. §§ 939.50(3)(a), 940.16(2). We stayed both the enforcement of the statute and further proceedings in the district court pending the decision of this appeal.
 
 
 2
 The statute defines a partial birth abortion as "an abortion in which a person partially vaginally delivers a living child, causes the death of the partially delivered child with the intent to kill the child, and then completes the delivery of the child." § 940.16(1)(b). The statute defines "child" to mean "a human being from the time of fertilization," § 940.16(1)(a), and the parties assume that "living" means having a heartbeat. Hence a partial birth abortion is criminal even if the fetus is not yet viable (that is, couldn't survive outside of the womb), provided that it has a heartbeat. The only exception to the statutory prohibition is where the partial birth abortion is "necessary to save the life of the [mother]." § 940.16(3).
 
 
 3
 The Wisconsin branch of Planned Parenthood, plus several physicians who perform abortions in Wisconsin, brought suit against the state's attorney general and other state law enforcement officials to enjoin the enforcement of the new statute, contending that it violates the Fourteenth Amendment. One of the plaintiff physicians regularly though infrequently performs the type of abortion variously termed "intact dilation and evacuation," "dilation and extraction," and (the term we'll use) "D & X." The others would like the option to consider performing it should the condition of a patient so warrant. The standing of the physician plaintiffs, and of Planned Parenthood as the owner of abortion clinics in Wisconsin, to maintain this suit is not open to question. Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Doe v. Bolton, 410 U.S. 179, 188-89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Not so the standing of the intervening defendants, two husbands of pregnant women, to be parties to the suit. As these men are passionately opposed to abortion of any kind and do not suggest that their wives disagree with them about the issue and so might consider undergoing a D & X, they have no significant interest in this litigation other than an ideological one. A purely ideological interest is not an adequate basis for standing to sue in a federal court, Diamond v. Charles, 476 U.S. 54, 67, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986); United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 739-40, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)--and we require such standing of all would-be intervenors. Solid Waste Agency v. U.S. Army Corps of Engineers, 101 F.3d 503, 507 (7th Cir.1996). If these men have standing to oppose a challenge to the partial abortion law, then any potential beneficiary of a statute could intervene in any suit challenging the statute's scope or validity, something no one believes. We add that there is nothing to suggest that the state is not an adequate representative of the intervenors' interests.
 
 
 4
 We turn from standing to the merits. The decision whether to grant a preliminary injunction requires consideration both of the likelihood that the plaintiff will win when the case is tried in full and of the relative harms to the parties of granting or denying the injunction. The stronger the likelihood that the plaintiff will win, the less of a showing he need make that the denial of the preliminary injunction would hurt him more than granting it would hurt the defendant. Hetreed v. Allstate Ins. Co., 135 F.3d 1155, 1158 (7th Cir.1998); American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593 (7th Cir.1986); EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir.1996); cf. Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir.1991). If the defendant is very likely to lose, allowing him to continue in his probably unlawful course of conduct until the end of what may be protracted proceedings would give him a windfall.
 
 
 5
 The balancing of the imponderables involved in the decision whether to grant or deny a preliminary injunction is a task calling for a judgment based on the particulars of the individual case. The district judge's decision is therefore entitled to considerable weight--the weight encapsulated in the concept of appellate review for "abuse of discretion." Fleet Wholesale Supply Co. v. Remington Arms Co., 846 F.2d 1095, 1097 (7th Cir.1988); American Hospital Supply Corp. v. Hospital Products Ltd., supra, 780 F.2d at 595; Smith, Bucklin & Associates, Inc. v. Sonntag, 83 F.3d 476, 479 (D.C.Cir.1996). But when it is clear that the plaintiff is both highly likely to prevail when the case is tried in full and is more likely to be harmed by the denial of preliminary relief than the defendant is to be harmed by its grant, we reverse. Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1120-21 (7th Cir.1997); Kirkeby v. Furness, 52 F.3d 772, 774 (8th Cir.1995); see also Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 657-64 (7th Cir.1995); August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 619-20 (7th Cir.1995). It should go without saying that in deciding these questions in this appeal we must, so far as it is humanly possible to do, lay to one side whatever personal reservations any of us may have either about abortion in general or about the decisions in which the Supreme Court has interpreted the Constitution as creating a right to abortion.
 
 
 6
 The origin of the statute challenged in this case is a paper by a physician describing the D & X method of abortion. Martin Haskell, "Dilation and Extraction for Late Second Trimester Abortion" (1992), reprinted in 139 Cong. Rec. E1092, 1993 WL 135664 (Apr. 28, 1993), and in The Partial-Birth Abortion Ban Act of 1995, Hearing before the S. Comm. on the Judiciary, 104th Cong., 1st Sess. 5 (Nov. 17, 1995). The procedure is employed rarely (though how rarely we don't know--there are no reliable statistics on this question), and usually only in late-term abortions (20 weeks or more). After the cervix (the mouth of the uterus), has been dilated, a process that can take several days, the D & X procedure is ready to begin. The physician draws the fetus out feet first. When only the fetus's head remains in the uterus, the physician inserts a scissors into the base of the fetus's brain, inserts a tube in the hole made by the scissors, and removes the contents of the skull by suction, causing the skull to collapse. The physician then completes the extraction of the now-dead fetus from the woman's body, death having occurred while the body of the fetus was in the vagina.
 
 
 7
 The unpleasantness of the procedure (and perhaps the fact that the only reason Haskell's paper gave for it is that it can be performed on an outpatient basis with a local anesthetic--though this implies that it may be safer for the woman than alternative methods of abortion) has given rise to a host of state statutes, as well as to bills in Congress (two of which President Clinton has vetoed), designed to outlaw it. There are differences among these statutes (see, e.g., Women's Medical Professional Corp. v. Voinovich, 130 F.3d 187 (6th Cir.1997), invalidating the Ohio statute), but we ignore them and confine our attention to the Wisconsin law. On the basis of the record compiled to date in this litigation--a potentially important qualification, since the full trial may cast the facts in a different light--it is apparent that whatever may be the case with the other statutes, Wisconsin's statute impermissibly burdens the constitutionally recognized right to an abortion in three respects.
 
 
 8
 First, it contains no exception for cases in which the fetus is not yet viable (that is, cannot survive outside the mother's body); all that is required, as we noted, is that the fetus have a heartbeat, and that is well before viability. The fetal heartbeat is detectable at 6 weeks, Robert Berkow et al., The Merck Manual 1851 (16th ed.1993), while in the present state of medical technology the fetus may become viable as early as 20 weeks into the pregnancy or as late as 27 weeks (or later--and some terribly malformed fetuses never attain viability). Therefore some D & X abortions (a procedure employed from week 20 on) are likely to be of fetuses that are not yet viable but have a heartbeat and so are protected by the statute. The statutory prohibition of aborting such fetuses--a prohibition that, remember, allows as the sole exception cases in which the mother's life is at stake--is unconstitutional.
 
 
 9
 Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), allowed states to regulate abortion after the first trimester even though most second-trimester and some third trimester fetuses are not viable. But in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court jettisoned the trimester framework of analysis and in the course of doing so ruled that government may not rely on its interest in the potential life of the fetus to interpose a significant obstacle to abortion before viability. Id. at 846, 112 S.Ct. 2791. It may adopt measures that, while not preventing the pregnant woman from deciding whether to have an abortion, remind her of the gravity of the choice and the value of fetal life. Id. at 877-78, 899-900, 112 S.Ct. 2791 (plurality opinion, but expressing a view supported by a majority of the Justices). And it may adopt paternalistic measures for the protection of the mother's health, as by requiring that only physicians be allowed to perform abortions. Mazurek v. Armstrong, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam). Although such a requirement might in principle pose a substantial obstacle to abortion, the record in Mazurek showed that it did not in fact. Id. 117 S.Ct. at 1866-67. But Wisconsin's law cannot be defended by reference to either rationale. It does not seek to make the woman more informed. It emphatically does not protect her health--it endangers her health, as we are about to see. It does not protect fetal life, for it merely bans one method of abortion, leaving all others unregulated regardless of the stage the pregnancy has reached.
 
 
 10
 Second, the statute contains no exception for the case in which a D & X, either before or after viability, is necessary for the preservation of the mother's health. Even if the mother would become sterile if an alternative procedure were used (or if she carried the fetus to term)--even if she would become paralyzed, or, as the state's lawyer affirmed at argument, put at a risk though not a certainty of death--the physician who performed the abortion would still be guilty of a crime that is punished as severely as Wisconsin, which does not have capital punishment, punishes murder. The Supreme Court has made clear that even a law limited to viable fetuses, as Wisconsin's is not, must make an exception "for pregnancies which endanger the woman's life or health." Planned Parenthood of Southeastern Pennsylvania v. Casey, supra, 505 U.S. at 846, 112 S.Ct. 2791; Women's Medical Professional Corp. v. Voinovich, supra, 130 F.3d at 209; Jane L. v. Bangerter, 61 F.3d 1493, 1504 (10th Cir.1995), rev'd on other grounds under the name Leavitt v. Jane L., 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam). Wisconsin's law contains no such exception, no matter how grave the threat to the woman's health short of a certainty of death.
 
 
 11
 The state tells us that there is no need for such an exception because there is no pregnancy in which an equally safe alternative procedure is not available. There is indeed always an alternative form of abortion to a D & X. But the alternative may not always be the best from the standpoint of the mother's health. The most common methods of late-term abortion (the only stage at which a D & X would be considered) are, first, medical induction, and, second, dilation and evacuation (D & E). In the most common form of induction, the physician injects into the uterus a substance designed both to kill the fetus and to induce labor, which will cause the fetus to be expelled. Less commonly, the physician will use a drug that merely induces labor, in which event the contractions will usually kill the fetus but in a few cases will (unintentionally, of course) produce a live birth. The most common alternative to induction is dilation and evacuation (D & E), the standard second-trimester method of abortion but sometimes employed later, often in conjunction with induction. D & E involves killing the fetus in the womb either by injecting a lethal drug into the fetus or by crushing its skull and removing the dead fetus (often piecemeal) with instruments. See generally Warren M. Hern, Abortion Practice 122-60 (1984); Mokhtar Toppozada, "Terminations of Pregnancy After 14 Weeks," in Modern Methods of Inducing Abortion 70 (David T. Baird, David A. Grimes & Paul F.A. Van Look eds. 1995).
 
 
 12
 Both induction and D & E pose risks to the mother. Induction, involving as it does labor, creates some of the same risks as childbirth itself (though presumably fewer because the labor involved in induction occurs earlier in the pregnancy), as well as a risk of injury from the drugs that are used. And when a nonlethal drug is used to induce the labor, the fetus may be born alive. D & E creates a risk of perforating the uterus and of leaving pieces of the fetus in the uterus, which may cause serious infection. The larger the fetus, the greater these risks. The D & X procedure is a variant of D & E designed to avoid both labor and the occasional failures of induction as a method of aborting the fetus, while also avoiding the potential complications of a D & E.
 
 
 13
 For some women, it may be the safest procedure. So at least the plaintiff physicians believe, and these beliefs are detailed in affidavits submitted in the district court. This is also the opinion of the most reputable medical authorities in the United States to have addressed the issue: the American Medical Association and the American College of Obstetricians and Gynecologists. See AMA, Report 26 of the Board of Trustees (1997); ACOG, Statement on Intact Dilation and Extraction (1997). It is true that the AMA has endorsed one of the federal partial-birth abortion bills (see its May 20, 1997, press release entitled "AMA Supports H.R. 1122 as Amended"), H.R. 1122, 105th Cong., 1st Sess. (1997) (as amended by the Senate that day). But the bill contains a number of safeguards absent from Wisconsin's law and in endorsing the bill the AMA did not retract the views expressed in Report 26.
 
 
 14
 The opinion of the medical authorities that for some women in some circumstances a D & X may be the safest procedure is just that, an opinion, or if you will a speculation, because the procedure has not been studied systematically, maybe because of its infrequency, novelty, and controversiality. But responsible medical opinion is often in advance of clinical trials, which may take many years to complete. Against the informed though not infallible opinion of the medical establishment the defendants offer only the virtually word-for-word-identical affidavits of five physicians. Insofar as they address the question of safety or health at all, these physicians make only two points, and make them without elaboration or supporting reasons. The first is that there are as yet no peer-reviewed, scientific studies of the relative safety of the D & X procedure, which is true but of little significance in itself, for the reason just noted. The second point, which mixes statutory interpretation with medical opinion, is that "in every situation where the life of the mother is not at risk--an exception permitted by the [Wisconsin] Act--the proposed procedure may be safely varied to avoid the prohibitions of the Act ... and/or commonly used, safe alternative abortion procedures may be used." The premise of this crucial assertion is false. The statute contains no exception for cases in which the life of the mother is merely "at risk." These physicians nowhere state that in every pregnancy there is an alternative procedure that will protect the health of the mother as effectively as a D & X would do. Their affidavits are thus no evidence at all concerning the health implications of banning the procedure, and leave the balance of evidence on the issue of health decisively inclined in favor of the plaintiffs.
 
 
 15
 Wisconsin law, following the Casey decision, forbids performing an abortion after the fetus has become viable unless the life or health of the mother is in jeopardy. Wis. Stat. § 940.15(3); see 505 U.S. at 879, 112 S.Ct. 2791. This means that the universe of lawful late-term abortions in Wisconsin is largely (not entirely, because some late-term abortions are of nonviable fetuses) confined to ones in which there is a health risk. These are precisely the cases in which it is most important for the woman's health that the physician have the maximum latitude to choose the procedure that is best in the particular circumstances.
 
 
 16
 Wisconsin is taking chances of unknown magnitude with the health of pregnant women. This the Supreme Court's decisions do not permit. Those decisions require that maternal health be the physician's paramount concern. Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 768-69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986); Colautti v. Franklin, 439 U.S. 379, 400, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); Planned Parenthood of Central Missouri v. Danforth, supra, 428 U.S. at 78-79, 96 S.Ct. 2831. It is true that Casey permits the state to trade off a de minimis risk to the mother's health against an interest in fetal life. Planned Parenthood of Southeastern Pennsylvania v. Casey, supra, 505 U.S. at 885-96, 112 S.Ct. 2791. But here there is no interest in fetal life. Casey upheld a 24-hour waiting-period requirement, the intention of which was to encourage the woman to rethink her decision to have an abortion. This case involves merely the method of abortion.
 
 
 17
 Nor is it clear that the risk is slight for all women; and in this respect the fact that the procedure is rare is irrelevant. A woman whose health depends on it will not be comforted to learn that Wisconsin has decided to ban the procedure because only a few women need it and so the state can make a low-cost statement of opposition to abortion rights.
 
 
 18
 Third, the statute is vague. Fearful of creating loopholes, Wisconsin decided not to forbid the specific procedure described by Dr. Haskell but to adopt a more sweeping prohibition. Loopholes are an entirely legitimate concern of legislatures, and despite much judge and lawyer talk about the imperative of clarity in criminal legislation, criminal laws are rarely struck down on grounds of vagueness; vagueness is recognized to be necessary to make criminal laws fully effective. 1 Wayne R. LaFave & Austin W. Scott, Substantive Criminal Law § 2.3(a), p. 128 (1986). It becomes a graver concern when it operates to deter the exercise of constitutional rights. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); Colautti v. Franklin, supra, 439 U.S. at 391, 99 S.Ct. 675; John C. Jeffries, "Legality, Vagueness, and the Construction of Penal Statutes," 71 Va. L. Rev. 189, 196 (1985); Note, "The Void-for-Vagueness Doctrine in the Supreme Court," 109 U. Pa. L. Rev. 67, 75 (1960). When vague statutes prescribe heavy penalties for violation, rational people avoid any conduct that might be thought to fall within the statute's scope, even if in an error free litigation the conduct would be sure to be found constitutionally protected. Hence a statute that punishes a class of constitutionally punishable abortions so vaguely that it makes doctors afraid to perform constitutionally permissible abortions is quite likely to infringe constitutional rights. Colautti v. Franklin, supra, 439 U.S. at 390-401, 99 S.Ct. 675; Charles v. Daley, 749 F.2d 452, 460 (7th Cir.1984); Women's Medical Professional Corp. v. Voinovich, supra, 130 F.3d at 203. Wisconsin's partial birth abortion statute is such a statute, especially given the severity of the punishment for violation. The threat of life imprisonment is bound to induce doctors to give the core of the statutory prohibition a wide berth. As a result, pregnant women in Wisconsin may find it impossible to obtain any type of abortion that might conceivably though mistakenly be held in a prosecution of the physician to be a partial birth abortion.
 
 
 19
 The statute does not define any of its terms except "child." But it must be read in light of the definition of "intentionally" elsewhere in Wisconsin criminal-law statutes as either acting purposely to accomplish the forbidden end or being "aware that [one's] conduct is practically certain to cause that result." Wis. Stat. § 939.23(3). As glossed by the case law in Wisconsin and elsewhere, this definition is satisfied by conduct carrying a known high risk of the forbidden result even if that result is not desired. See State v. Gould, 56 Wis.2d 808, 202 N.W.2d 903, 906 (Wis.1973); State v. McCarter, 36 Wis.2d 608, 153 N.W.2d 527, 529 (Wis.1967); United States v. United States Gypsum Co., 438 U.S. 422, 444-46, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); Smith v. Farley, 59 F.3d 659, 663 (7th Cir.1995); United States v. McAnally, 666 F.2d 1116, 1119 (7th Cir.1981); 1 LaFave & Scott, supra, § 3.5(a)-(c), pp. 304-11. The district court gave an example, finding on the basis of uncontradicted evidence that in some instances of medical induction the fetus still has a heartbeat when it enters the birth canal. If so, often death will occur there. Perhaps, therefore, a Wisconsin court would allow a jury to find that a physician who performed medical induction on a regular basis (as one of the plaintiffs does) was "practically certain" that he was causing a certain number of fetuses to die in the birth canal. Or perhaps not. But even if the probability of prosecution and conviction of such physicians is small, it doesn't take a high probability of such consequences to have a deterrent effect when the penalty upon conviction is life in prison.
 
 
 20
 The state's argument that induced labor is not a form of physician-assisted delivery has no support in the statute and is contrary to common usage. Often labor is induced by a physician when a pregnant woman reaches the end of her term and fails to go into labor spontaneously, or earlier if the health of the mother or fetus would be endangered by waiting.
 
 
 21
 The statute's infirmities are magnified by the difficulty that the state's lawyers have had in explaining what interest the statute is designed to protect. Even if the standard for judicial review of state abortion laws challenged under the due process clause of the Fourteenth Amendment were merely that of rational relation to a legitimate state interest, Wisconsin's partial birth statute would be in trouble. Not because states do not have legitimate interests in the regulation of abortion, especially late-term abortions, but because the Wisconsin statute does not seem rationally related to any of those interests, and in particular to the interest in the preservation of fetal life. If the state is right that there is always an equally safe alternative form of abortion to a partial birth abortion, then the statute cannot discourage abortions--cannot save any fetuses--but can merely shift their locus from the birth canal to the uterus. What interest has the state in such a shift? This is not a statute, like the one upheld in Casey, rationally designed to protect fetal life by making women think carefully about alternatives to abortion (such as completing the pregnancy and putting up the baby for adoption). It is not a statute designed to protect a woman's health; on the contrary. And it can save fetuses only by endangering pregnant women, since the only time a woman denied a partial birth abortion will decide to carry the fetus to term is when the alternative methods of abortion would pose a greater risk to her. No argument is made, and we are not aware of any basis for such an argument, that if a fetus feels pain, the pain is worse when the fetus is killed in the birth canal than when death occurs a moment earlier in the womb. And therefore Wisconsin's statute cannot be analogized to statutes that prohibit cruelty to animals.
 
 
 22
 Partial birth abortion is a gruesome procedure. But all abortion procedures, and indeed a vast number of surgical procedures unrelated to the reproductive process, including forms of cosmetic surgery that strike many people as frivolous, are bloody and horrible. It is difficult to see how anyone acquainted with abortion techniques (lucidly described in Alan F. Guttmacher & Irwin H. Kaiser, "The Genesis of Liberalized Abortion in New York: A Personal Insight," in Abortion, Medicine, and the Law 546, 557-564 (4th ed., J. Douglas Butler & David F. Walbert eds., 1992)) could suppose partial birth abortion more gruesome than the alternatives that Wisconsin has not attempted to prohibit. In a first-trimester abortion the physician uses either surgical instruments or a suction pump to remove the fetus from the uterus. D & E, standard in a second-trimester abortion, routinely involves the crushing of the fetus's cranium; and even in first-trimester abortion the fetus is sometimes removed piecemeal; "if a fetus beyond 10 weeks of age is recognized, the fragments should be reassembled to see if the fetus is essentially complete" because any fetal tissue remaining in the uterus could cause infection. Michael S. Burnhill, "Reducing the Risks of Pregnancy Termination," in Prevention and Treatment of Contraceptive Failure: In Honor of Christopher Tietze 141, 145 (Uta Landy & S.S. Ratnam eds.1986); see also Guttmacher & Kaiser, supra, at 558-560; David A. Grimes & Kenneth F. Schulz, "Morbidity and Mortality from Second-Trimester Abortions," 30 J. Reproductive Medicine 505, 508 (1985). In the rare third-trimester abortion, the doctor may kill the fetus by injecting a chemical into the fetus's heart or by drilling a hole in the fetus's cranium and removing the fetus's spinal fluid through the hole.
 
 
 23
 We do not question a state's right to express moral indignation through its criminal law, Milner v. Apfel, 148 F.3d 812, 814 (7th Cir.1998), but of course that right is limited by the constitutional rights of the persons whose conduct the state seeks to punish. And we have difficulty understanding--and the state's briefs and argument have made no effort to explain--how a rational legislature could sense a moral difference between the method of concededly lawful abortion described at the end of the preceding paragraph and the partial birth method that the statute forbids under penalty of life imprisonment.
 
 
 24
 Nor do we question the state's right to regulate the practice of medicine. But when that right comes into collision with a constitutional right, the state has to give a reason for regulating medicine in a way that impairs the interest that the constitutional right seeks to protect. Obviously a state would not be permitted to justify a law forbidding black doctors to treat white patients on the ground that it was a regulation of medicine.
 
 
 25
 We also do not doubt that if in the course of a normal labor the mother asked her obstetrician to kill the baby in the birth canal and he did so, the state could criminalize this act as infanticide. Cf. Wis. Stat. § 940.05. But here, to repeat, the state has criminalized merely a procedure, and acknowledged the right to abort by an alternative procedure the same fetus whose death by partial birth abortion would subject the doctor to punishment as a murderer. So there is no issue of infanticide, of killing a live baby that is half-born.
 
 
 26
 The constitutional right to an abortion carries with it the right to perform medical procedures that many people find distasteful or worse. The singling out of the D & X procedure for anathematization seems arbitrary to the point of irrationality. Annexing the penalty of life imprisonment to a medical procedure that may be the safest alternative for women who have chosen abortion because of the risk that childbirth would pose to their health adds a note of the macabre to the Wisconsin statute, especially when we consider that physicians can insulate themselves from all legal risk by killing the fetus in utero. The only fetuses whom the statute will save are those whose mothers are afraid for reasons of health to undergo an alternative procedure to a partial birth abortion.
 
 
 27
 This question of just what interest of the state the partial birth abortion statute protects bears on the balance of harms involved in the decision whether to grant or deny preliminary relief against the statute. If that relief is denied and the statute is permitted to go back into force, a few fetuses will die in a manner different from what the physician would prefer and some women will be endangered; no fetuses will be saved unless physicians are deterred by threat of life imprisonment from performing any type of late-term abortion. The balance favors the grant of preliminary relief; the case for that relief becomes conclusive when the constitutional defects of the statute are considered.
 
 
 28
 The decision of the district court is reversed with directions to grant a preliminary injunction against the enforcement of the Wisconsin partial birth abortion statute and to dismiss the defendant intervenors as parties.
 
 
 29
 REVERSED.
 
 
 30
 MANION, Circuit Judge, dissenting.
 
 I.
 
 31
 "Partial birth abortion" is neither a legal nor a medical term. That is why some legal and medical experts have difficulty determining the parameters of the Wisconsin statute that attempts to ban the procedure. Nevertheless, members of the Wisconsin legislature as well as many state legislatures around the country and a significant majority of the U.S. Congress seem to have a grip on what they want to outlaw. Medically the procedure is called intact dilation and extraction, or D & X. As this court succinctly explained, ante at 466, the living fetus is maneuvered so that it can be pulled from the uterus feet first until the head (the largest part of the body) becomes lodged in the cervix. The physician then uses scissors to create a hole in the base of the skull through which he inserts a suction tube that removes the "contents," causing the skull to collapse. "The physician then completes the extraction of the now-dead fetus from the woman's body, death having occurred while the body of the fetus was in the vagina." Id. It is easy to understand why significant majorities of citizens want this procedure banned.
 
 
 32
 Although a very rare procedure, the D & X has been graphically described and publicized by opponents of abortion. Likely this has helped inspire the many legislative enactments. But the many court challenges have further attracted public attention. Here, Planned Parenthood and the other plaintiffs aren't merely defending the right of doctors to perform or for a woman to have a D & X abortion. In fact, they insist this procedure almost never happens. Rather, they claim that the Wisconsin statute is overbroad and vague--that doctors could face life in prison for performing, usually in the second trimester, routine dilation and extraction abortions (D & E) where the fetus is dead before it is removed, usually in several pieces, from the mother's body. This argument has certainly shifted the focus of the debate. Heretofore, the argument over abortion was mostly confined to rights--those favoring abortion rights defend a "right to choose"; those opposing abortion rights proclaim a "right to life." But partial birth abortion has advanced the debate to the specifics of abortion procedures--the methods used, the impact on the unborn child at various stages of gestation, and the health risks to the mother. In the process of aggressively challenging the laws banning partial birth abortion, the abortion rights proponents have (with commendable candor) graphically described in detail how routine abortions are performed, depending on the age of the unborn. In this case they have engaged in this exposure to underscore their contention that the Wisconsin law banning partial birth abortions is so overbroad that it covers most post-viability abortions (after 22 weeks) and many pre-viability abortions. In other words, rather than denying that they engage in a procedure that many legislatures and the federal Congress have called unacceptable, they claim that they routinely perform the procedures that the statute arguably describes; thus the law would limit a woman's right to have an abortion. (For example, Dr. Christensen explains in his affidavit that in the process of "disarticulation" during a mid-term abortion, a separated fetal "part" might protrude outside the birth canal, leaving behind living cells and a beating heart.)
 
 
 33
 In my opinion the district court's decision at this preliminary injunction stage is correct. The district court accurately labeled the "plaintiffs' alleged confusion concerning the meaning of Act 219 [as] a demon of their own creation." To avoid having to defend the almost indefensible D & X procedure, the plaintiffs have stretched the plain meaning and intent of the statute to cover almost every abortion procedure that occurs after a few weeks, when the fetal heartbeat begins. Once this fabrication is in place they proclaim that the expanded law bans routine D & E and even some suction curettage abortions--the kind they perform every day. Obviously the Supreme Court has established a right to these routine abortions, so expanding the statute to cover them makes the plaintiffs' challenge more widely acceptable. In other words, in order to level what they see as an effective attack on the ban, they have to pretend the statute is what it is not. But as the district court has concluded, 9 F.Supp.2d 1033, 1041 (W.D.Wis.1998), the statute unmistakably regulates only the rare D & X procedure that is used exclusively post-viability, when "potential life" is a reality. Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The district court properly discarded the plaintiffs' broad interpretation of the Act when they equated " 'a living child' with 'dismembered portions of a living child.' This Court, the Wisconsin Legislature and common sense reject such an interpretation." 9 F.Supp.2d at 1041 (Footnote omitted). The district court has thoroughly examined the evidence before it at this preliminary stage, and has correctly concluded that when the statute is narrowly construed in accordance with Wisconsin law, the standards for denying a preliminary injunction are met.
 
 II.
 A. Standard of Review
 
 34
 At this stage the district court has correctly denied the preliminary injunction motion. Planned Parenthood sought a preliminary injunction enjoining 1997 Wisconsin Act 219 from taking effect. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948, at 129-130 (2d ed.1995)) (emphasis by Supreme Court) (reversing Ninth Circuit's reversal of a district court's denial of a preliminary injunction of a state law allowing only physicians to perform abortions). Under this standard, Planned Parenthood must show that it has more than a negligible chance of success on the merits, and no adequate legal remedy. Once this is established, the district court must then consider the balance of hardships between the plaintiffs and the defendants, adjusting the hardships for the probability of success on the merits. Boucher v. School Bd. of the Sch. Dist. of Greenfield, 134 F.3d 821, 824 (7th Cir.1998).
 
 
 35
 We give deference to the district court when reviewing its decision to deny a preliminary injunction. That means to reverse, the district court's finding of facts must be clearly erroneous, and the district court's balancing of harms in favor of one party must be an abuse of discretion. Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1114 (7th Cir.1997). On issues of law, we review the district court de novo, id., but just like the state courts, we owe deference to the Wisconsin legislature. Therefore we must first presume this statute to be constitutional, and if possible, interpret it so as to preserve its constitutionality. See Andree v. Ashland County, 818 F.2d 1306, 1313 (7th Cir.1987). The Wisconsin Supreme Court has noted that a "party challenging [a] statute must show it to be unconstitutional beyond a reasonable doubt." Wisconsin v. Carpenter, 197 Wis.2d 252, 541 N.W.2d 105, 109 (Wis.1995). That is a heavy burden for the plaintiffs at the preliminary injunction stage. The court has further noted that " '[e]very presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality.' " Id. (quoting Wisconsin v. McManus, 152 Wis.2d 113, 447 N.W.2d 654 (1989)). Thus, the plaintiffs must not only overcome the deference owed the district court's factual findings and weighing of hardships, but must also overcome the legal presumption that the Act is constitutional.
 
 B. Likelihood of Success on the Merits
 
 36
 The appellants argue that they have a likelihood of overcoming the presumption of constitutionality because the partial birth abortion act places an undue burden on a mother's constitutional right to an abortion,[1] and second, because the Act is vague and overbroad it fails to give adequate notice of what it criminalizes.
 
 
 37
 1. The undue burden test.
 
 
 38
 To reconcile the conflict between a mother's constitutional rights implicated in an abortion decision, and the government's interests in potential life and the regulation of medical procedures, a plurality of the Supreme Court stated that a state regulation is unconstitutional when it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of the nonviable fetus." Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. at 877, 112 S.Ct. 2791 (plurality). (Although the lead opinion in Casey was joined by only three Justices, it is the holding of the Court under Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).) In so doing, the Court repudiated decisions such as Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), because they "undervalue[d] the State's interest in potential life." 505 U.S. at 873, 112 S.Ct. 2791. Rather, the Casey Court recognized that "Not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right.... Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure." Id. at 873-74, 112 S.Ct. 2791. Under Casey, a plaintiff challenging a statute must prove "that in a large fraction of the cases in which [the Act] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Id. at 895, 112 S.Ct. 2791.
 
 
 39
 The district court has given the statute its proper (and logical) narrow construction, thus confining the ban to the D & X abortion procedure. Contrary to the claim of the plaintiffs, the court concluded that the law has no effect on the commonly-used D & E procedure used for both pre and post-viability abortions. The record does not show that any pregnant woman would forego, or be prevented from having, an abortion because the D & X procedure was not available. The D & X procedure is very rarely used, which suggests that a ban would have a minimal if any effect on abortion practices. As this court notes, the D & X is not even considered except for late-term abortions, ante at 467, but according to the AMA report, 89% of all abortions occur within the first 12 weeks of pregnancy, and only 1 percent occur after the twentieth week. Similarly, among the plaintiff physicians, only Dr. Christensen performs D & X abortions.[2] In 1997, he performed 2350 abortions in Wisconsin, 300 of which were second trimester abortions. Yet, he performs only one or two D & X procedures per year. And Dr. Bernard Smith, who performed approximately 2500 first trimester and 500 second trimester abortions in Wisconsin in 1997, does not even perform the D & X procedure. It seems counterintuitive that before the law was enacted Dr. Smith had decided not to perform the D & X procedure, yet he now contends that the absence of the D & X is a substantial obstacle to a woman obtaining an abortion. This disingenuity is what likely caused the district court to conclude at this juncture that the defendant's experts were more credible than the plaintiffs'.
 
 
 40
 Even when confined to the D & X procedure, the Act could still be unconstitutional if a large fraction of women who would otherwise have a D & X abortion decide to carry the child to term because of the greater medical risks involved in alternative abortion options. But the record does not support this contention. For example, the American Medical Association stated that "[a]ccording to the scientific literature, there does not appear to be any identified situation in which the intact D & X is the only appropriate procedure to induce abortion...." Similarly, the American College of Obstetricians and Gynecologists ("ACOG") wrote that "[a] select panel convened by the ACOG could identify no circumstances under which the [D & X], as defined above, would be the only option to save the life or preserve the health of the woman." Moreover, none of the physicians indicate that they have ever encountered a situation where the D & X procedure is the only procedure available to save the life or preserve the health of the mother. As the district court found, "[a]bsent from the record is a showing that [the D & X procedure] is safer in any significant way from conventional D & E's." Nothing in the record, or the court's opinion, demonstrates that this finding is clearly erroneous, and the district court correctly concluded that the ban on the D & X procedure does not place a substantial obstacle in the path of a woman deciding to have an abortion.
 
 
 41
 2. Vagueness.
 
 
 42
 The plaintiffs contend that the Act is ambiguous, that is, susceptible to different interpretations. Once this straw baby is in place, they go on to argue that physicians will refrain from performing legal abortions for fear of "arbitrary application," presumably by Wisconsin's prosecutors and courts. Of course, as the district court points out, "plaintiffs' confusion concerning the meaning of [the Act] is a demon of their own creation." 9 F.Supp.2d at 1041. They graphically describe the gruesome details of routine abortions in order to equate them with the D & X procedure that the statute describes. Despite this concern, they have not sought a definitive construction of the statute by Wisconsin's courts; rather, they have marched directly to the federal courthouse, even though they now blithely contend that "the district court's interpretation is not binding on anyone." Appellants' Brief at 40. "[A]n important difference between the interpretation of a state statute by a federal court and by a state court is that only the latter interpretation is authoritative." Kucharek v. Hanaway, 902 F.2d 513, 517 (7th Cir.1990). By enjoining the Act in its entirety, this court has "deprive[d] the state courts of an opportunity to save at least a part of the statute by a narrowing interpretation. As a matter of comity, states ought to have that opportunity...." Id.
 
 
 43
 Moreover, the ambiguities suggested by the plaintiffs are not plausible. The plaintiffs contend that the Act's phrase "a person partially vaginally delivers a living child" applies to every D & E procedure:
 
 
 44
 [T]he Act remains applicable to D & Es whenever a portion of the fetus has been partially vaginally delivered before it is disarticulated.... This limitation also leaves the physician subject to prosecution if he extracts a disarticulated limb; and then reaches into the uterus a second time, extracts a second limb which is not disarticulated and the fetus has not yet expired.
 
 
 45
 Appellants' Reply Brief at 4. The district court correctly held that no reasonable person would equate the dismembered portions of a child with a "living child," and thus, the Act could not be fairly interpreted to apply to the D & E procedure. The total destruction of the fetus ("disarticulation" as they put it) is accomplished within the womb. This process is clearly distinguishable from the D & X. This analysis further demonstrates the Act is easily susceptible to a narrow construction (it bans only the D & X procedure), and the state courts should have been given the opportunity to adopt this construction, a construction all of the state's prosecutors were prepared to apply.
 
 
 46
 The scienter, or intent, requirement of the statute significantly raises the bar for prosecutions, negating any legitimate claim of ambiguity. In only the D & X procedure is a child practically certain to be alive in the birth canal, and then killed by the physician. This does not mean that it never occurs in other procedures, but the gulf between a rare occurrence and something "practically certain" to occur is recognized under Wisconsin law. Cf. State ex rel. Zent v. Yanny, 244 Wis. 342, 12 N.W.2d 45, 47 (Wis.1943) (criminal negligence "is something less than willful and wanton conduct which, by the law of this state, is the virtual equivalent of intentional wrong."). It would seem that the physicians' greatest concern would be the situation where the physician begins a non-partial birth abortion, for example a D & E, but by accident partially vaginally delivers a living child, kills it, and then completes the delivery. In that situation, the state would be required to prove beyond a reasonable doubt that the physician intended to perform a D & X, or that the D & X was a practically certain result; this provides physicians ample protection. Interestingly, Dr. Christensen did not find it necessary to cease his abortion practice during the five weeks between the Act becoming effective and our stay pending appeal. See Defendant-Appellee's Separate Appendix at 165 (press release dated May 21, 1998 in which Dr. Christensen states that he will continue to provide a "full range" of abortion services). This speaks volumes about Dr. Christensen's true view concerning the vagueness of the Act.
 
 
 47
 The district court found that the plaintiffs had a small likelihood of success on the merits. Given the scant record developed before him, the plaintiffs' failure to identify any medical necessity compelling the use of the partial birth abortion, and the evidence establishing the rarity of the partial birth abortion, this finding was not clearly erroneous.
 
 C. Irreparable Harm
 
 48
 1. Harm to the plaintiffs.
 
 
 49
 The district court found that the plaintiffs would not be irreparably harmed if the Act were not enjoined. The plaintiff physicians did not indicate in their affidavits that they will cease to provide abortions because of this Act, and none of them indicate that any woman will be denied an abortion because of this Act. Similarly, we have no reason to believe that the Act will be misapplied, or that unjustified prosecutions will ensue. The sole basis relied on to support a possible of finding irreparable harm is that the Act will "force women to undergo less safe procedures than their physicians would otherwise perform." But the record in this case indicates that alternative procedures to the D & X are not less safe. As explained in Casey, in the absence of any evidence demonstrating how less safe the alternative procedures are (and thus, how likely a pregnant woman would opt for no abortion), a finding of irreparable harm is entirely speculative.
 
 
 50
 2. Harm to the defendants and the public interest.
 
 
 51
 The defendants have not identified how they would be harmed by an injunction of this Act, which is not surprising because they are merely representatives of the State, with no personal interest in the Act. However, the public interest must also be considered. It is beyond dispute that the public has a strong interest in duly passed laws becoming effective and being respected. It is this respect for the democratic process and the will of the people that justifies a presumption of constitutionality for legislative enactments. The public also has a significant interest in the regulation of medical procedures. This interest was recognized in Casey, and can only be outweighed by a mother's constitutional liberty when the effect of the regulation is to deny or significantly limit the availability of all abortion procedures. Further, as the court's opinion recognizes, the D & X procedure is only considered in late term abortions, where the state's interests in the treatment and protection of potential life is greatest. Ante at 467. The district court weighed these interests against the scant evidence of harm alleged by the plaintiffs, and found that the preliminary injunction was unwarranted. This is not an abuse of discretion.
 
 
 52
 Summarizing, I would affirm the district court's findings that the plaintiffs had a small likelihood of success on the merits, and had demonstrated little if any irreparable harm. Further, I would conclude that the district court's weighing of the plaintiffs' harm against the public's interest, and ultimate decision not to impose a preliminary injunction, was no abuse of discretion.
 
 III.
 
 53
 Although I have set out the reasons why I would affirm the district court's denial of the preliminary injunction, I also have a few observations regarding this court's decision to reverse. As the court notes, according to Casey, the government may regulate pre-viability abortions unless so doing poses a substantial obstacle to a woman obtaining an abortion. Yet, the court does not conclude that the unavailability of the D & X procedure presents that substantial obstacle. Instead, it holds that the law cannot be justified as furthering interests such as better informing the mother contemplating abortion, protecting her health, or protecting fetal life. Ante at 466-67. This holding misapplies Casey, which held that "the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." 505 U.S. at 876, 112 S.Ct. 2791. Casey also noted that "the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest" otherwise.[3] 505 U.S. at 885, 112 S.Ct. 2791. Casey does not limit the forms of regulation permitted by the Constitution; rather, it makes clear that all regulation is permitted, provided the regulation is not unduly burdensome to a woman's right to an abortion.
 
 
 54
 This court sidesteps the undue burden test and instead concludes that Wisconsin has no legitimate interest in enacting the partial birth abortion ban. This conclusion parallels the reasoning of decisions such as Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), which were substantially limited in Casey. Casey held that these cases were in error because they did not accord proper weight to Roe's acknowledgment of the government's "important interest in potential life." Casey, 505 U.S. at 882, 886, 112 S.Ct. 2791. Requiring that Wisconsin specify the particular interest it is furthering with this statute is a throw-back to the pre-Casey law.
 
 
 55
 Of course Wisconsin has several interests it could advance, the most obvious being to do something to preserve the "potential life" of the unborn. As the court notes, with alternative procedures to the D & X available, the statutory ban does little to protect the fetal life. But Wisconsin's legitimate interests surely go beyond rescuing the unborn. Unquestionably, Wisconsin has a material interest in how all medical procedures--including abortions--are performed by physicians licensed by the state; this is "part of the practice of medicine [which is] subject to reasonable licensing and regulation by the State." Casey, 505 U.S. at 884, 112 S.Ct. 2791. This general interest allows it to regulate who performs abortions, where abortions are performed, and what is required for informed consent to be given. Id.
 
 
 56
 There is a legitimate moral interest as well. The ban on the D & X procedure can be deemed appropriate simply because of the grotesque nature of the procedure itself and the wide public awareness of it. That is not to say that all methods of legal abortion are not equally lethal and unseemly. As the court acknowledges, all methods are gruesome. But this is the one method that has been at least partially exposed to the light of day, and this exposure has apparently caused the Wisconsin legislature to label the D & X immoral. And certainly Wisconsin can legislate morality. Cf. Milner v. Apfel, 148 F.3d 812, 814 (7th Cir.1998) ("How else to explain prohibitions against gambling, prostitution, public nudity and masturbation, fornication, sodomy, the sale of pornography, sexual intercourse with animals, desecration of corpses, and a variety of other 'morals' offenses? A traditional purpose of criminal punishment is to express moral condemnation of the criminal's acts."). This apparent (or at least plausible) perception that it is cruel and gruesome is comparable, albeit on a lesser scale, to the state's legitimate interest in the criminalization of the killing of animals through decompression or the shooting of caged animals. See Wis. Stats. §§ 951.025, 951.09. These statutes do not save any animals; they merely regulate the manner in which they are killed. An uncaged animal does not suffer less when shot as compared to a caged animal, but Wisconsin still criminalizes the latter, and not the former.[4] Likewise, every method of abortion effectively destroys the "potential life" of the fetus. And as the court observes, partial birth abortion is no "more gruesome" than alternative abortion procedures performed regularly. But the court overextends when it concludes that there is no moral difference between partial birth abortion and other abortion procedures. Ante at 470-71. That is a decision for Wisconsin to make--a decision it has every right to make as long as it does not unduly burden the mother from obtaining another method of abortion. As I note below, this moral outcry apparently has not fallen on deaf ears. The exposure of this procedure has cast a bright light on the alternative procedures that are equally gruesome. This additional information could foreseeably cause mothers seeking abortions to have second thoughts, thus giving the potential life in which the state unquestionably has an interest another chance to live.
 
 
 57
 The state's interests in potential life, in regulating the practice of medicine, and in the moral underpinnings of state law are legitimate and form a solid basis for the state enacting a statute to ban D & X abortions. It is for the Wisconsin legislature, not this court, to determine whether and how to address these interests. Cf. Lochner v. New York, 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting) ("I strongly believe that my agreement or disagreement has nothing to do with the right of the majority to embody their opinions in the law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious, or if you like as tyrannical...."). Balanced against the unrefuted fact that mothers seeking an abortion had access to available substitute procedures, the district court did not abuse its discretion in denying the preliminary injunction.
 
 
 58
 The court also faults the statute for not having an exception for the mother's health. The court takes the view that "the alternative [to the D & X] may not always be the best from the standpoint of the mother's health." Ante at 467. As noted above, I have serious doubts that the record in this case supports this conclusion. Both the AMA and the ACOG were unable to identify any situation in which the D & X is safer than alternatives. The mere suggestion by these medical groups that physicians should have unfettered discretion in deciding how to perform an abortion is insufficient to support the conclusion that the D & X is safer than other abortion procedures. Similarly, Dr. Christensen very rarely performs the D & X procedure, and Dr. Smith, who performs 3000 abortions per year, does not use the D & X. The safety of the alternatives is demonstrated by Dr. Smith's complete avoidance of the procedure, and Dr. Christensen's use of the D & X in only 1-2 of the 2300 abortions he performs each year. Thus it is disingenuous, to say the least, for them to say it may be the safest procedure for some women. The D & E method may create risks, but it is the one used in 99% of abortions performed after 12 weeks' gestation.
 
 
 59
 But even if we put aside this factual dispute, the legal conclusion reached by the court is still insufficient to invalidate the Act. To fail the undue burden test, the alternatives to the D & X must be sufficiently risky as to present a substantial obstacle to a woman obtaining an abortion. The district court concluded that this fact was not present in the record, and the court agrees to the extent that the risk of alternatives to the D & X, as compared to the D & X itself, are "unknown." Ante at 468. There is no suggestion in the court's opinion that the risks are more than "de minimis." Id. Casey addressed a similar lack of evidence, and concluded the challenged law should not be presumed to be unconstitutional. The Court was faced with Pennsylvania's law imposing a 24-hour waiting period between a woman requesting an abortion and the abortion procedure being performed. 505 U.S. at 885-86, 112 S.Ct. 2791. The Court noted that this delay, in practice, generally results in a longer delay than 24 hours, and may increase the woman's exposure to harassment and hostility of protesters outside abortion clinics. Id. at 886, 112 S.Ct. 2791. Further, the Court noted that the delay increased the cost and risk of abortion procedures. Id. But the Court concluded that despite this evidence, the waiting period did not impose "a real health risk." Id. Comparatively speaking, the partial birth abortion ban seems much less burdensome than even the 24-hour delay that the Court approved. As this court notes, the Act "merely bans one method of abortion, leaving all others unregulated," ante at 467, and the court does not conclude that the unknown differences between the D & X and alternative procedures amount to an "appreciable health risk," as Casey requires to implicate constitutional concerns. Id. at 885, 112 S.Ct. 2791. If, as the court notes, it is not "clear that the [health] risk is slight," ante at 469, then the plaintiffs obviously have not met their burden of showing that the health risk is appreciable.
 
 
 60
 The court also cites several pre-Casey decisions for the proposition that maternal health must be the physician's paramount concern. Ante at 468. The court's reliance on these cases is misplaced; rather, Casey's undue burden test is the law, and the court must apply it. No doubt maternal health remains a significant interest, but in the absence of an "appreciable health risk," 505 U.S. at 885, 112 S.Ct. 2791, the state may impose a reasonable burden. And any burden imposed here is negligible at most.
 
 
 61
 Finally, I take issue with the court's ruling that the defendant-intervenors lack standing to participate in this litigation. This issue was not raised in the briefs; we did not have the benefit of argument by any of the parties. Also, because the defendant-intervenors were denied an opportunity to present oral argument, we were not able to explore this issue. The court presumes that the defendant-intervenors' spouses share their views of abortion. This presumption is not only factually unsupported, but it also appears that the Supreme Court has presumed the opposite. The Casey Court, in holding that a spousal notification requirement was unconstitutional, reasoned that "a spousal notice requirement enables the husband to wield an effective veto over his wife's decision [to undergo an abortion]." Casey, 505 U.S. at 897, 112 S.Ct. 2791. It certainly seems incongruent that the spousal notification law was unconstitutional because husbands and wives may disagree on whether the wife should have an abortion, but in this case, we presume that they share the same view on the desirability of aborting their child. This presumption is particularly unwarranted because the defendant-intervenors are participating as representatives of all husbands and fathers whose rights are affected by the Act. And this representational status is certainly appropriate given that pregnancy is the classic case "capable of repetition, yet evading review." Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This decision effectively denies the defendant-intervenors the opportunity to be heard, to present arguments, and to develop a record on this issue. If the court is concerned that the defendant-intervenors lack standing, the district court should be directed to review this issue and make appropriate findings, which we would then review in the standard due process.
 
 IV.
 
 62
 This is a very unpleasant case. Without question in 1973 the Supreme Court in Roe v. Wade established a woman's right to have an abortion. Roe also went on to say that "if the state is interested in protecting fetal life after viability, it may go so far to proscribe abortion during that period except when it is necessary to preserve the life or health of the mother." Roe, 410 U.S. at 163-64, 93 S.Ct. 705. Although one question before us is whether the state's proscription of partial birth abortion interferes with the mother's health, the plaintiffs' primary complaint is that this "vague" and "overbroad" statute interferes with the woman's right created in Roe. To verify this interference the plaintiffs have set out in grotesque detail how human fetuses at every stage of development--"potentiality of human life," as Roe puts it--are destroyed and dismembered with suction, scalpels, scissors, and other medical instruments usually used to save lives. The state has attempted to ban one rare procedure, not many as the plaintiffs insist and as this court affirms. And there is no evidence of any appreciable threat to a mother's health if she cannot obtain a D & X. Thus, even under the restrictions of Roe, a state should surely be able to proscribe an "abortion" of a live baby that is half-born.
 
 
 63
 As the court notes in its rational basis discussion, if there is always an equally safe alternative to a partial birth abortion, "the statute cannot discourage abortions--cannot save any fetuses--but can merely shift their locus from the birth canal to the uterus." Ante at 470. No doubt when this statute is properly construed--that it bans only the rarely-used D & X procedure--it does not appear to accomplish much in the way of saving babies. But these laws have certainly elevated the public's concern over the fate of the "potential human lives" that are exposed to abortion.
 
 
 64
 In Planned Parenthood of Southeastern Pennsylvania v. Casey, the Supreme Court turned the spotlight on the more obscure language in Roe v. Wade--that the state retains an "important and legitimate interest in potential life." Casey, 505 U.S. at 871, 112 S.Ct. 2791. Casey, while reaffirming a woman's right to have an abortion, seems to place no limit on the state's ability to require that a woman considering an abortion be fully informed of the "consequences to the fetus, even when those consequences have no direct relation to her health." Id. at 882, 112 S.Ct. 2791. Therefore, as long as the information is truthful and not misleading, "informed choice" can include considerations of the effect of abortion on the unborn child. This court criticizes what it perceives to be an arbitrary and irrational legislative effort singling out the D & X procedure, a "gruesome" procedure which almost never occurs. Ante at 470-71. With this criticism in mind, following the Supreme Court's green light for informed choice in Casey, the legislature might find a more effective way to reduce abortions by requiring that mothers contemplating abortion be given the information similar to that which the plaintiffs have supplied in this case. A woman might consider adoption as an alternative after having to read Dr. Christensen's affidavit where he describes how he "disarticulates" the fetus and otherwise destroys the "beating heart and living cells." Or perhaps the abortion doctor should explain, in line with the court's reference to Michael Burnhill's article, ante at 470, that beyond ten weeks' gestation, "the fragments should be reassembled to see if the fetus is essentially complete." Or, on a more positive note, when the abortion doctor does a precautionary ultrasound to determine whether the fetus is six or sixteen weeks along, why not require that he turn the screen so that the woman can see the image of her baby and its stage of development? She would at least have a limited view of a beating heart, the beating heart the doctors in today's case are so concerned about leaving behind when they pull one dismembered part of the fetus from the mother's body. In another direction, perhaps the state could require that although a woman's right to an abortion cannot be unduly burdened, if a baby can survive the abortion the state must protect it. In other words, in every abortion does the baby necessarily have to die? See Floyd v. Anders, 440 F.Supp. 535 (D.S.C.1977) (three-judge panel), vacated, 440 U.S. 445, 99 S.Ct. 1200, 59 L.Ed.2d 442 (1979).
 
 
 65
 The state's interest in potential life cannot be ignored, and the district court was correct in applying a narrow construction to this law and denying the injunctive relief that this court has now granted. The court today acknowledges that partial birth abortion is gruesome, but it notes that so are many surgical procedures. But this is no routine surgical procedure. In a gall bladder operation, for example, the doctor removes and destroys a diseased organ, leaving behind a healthier person. In partial birth abortion, the doctor destroys a "potential" life. Perhaps the mother is healthier, but the baby is dead. In a Caesarian delivery, perhaps gruesome to see by some standards, the doctor snips the umbilical cord and removes a live baby. In a partial birth abortion, the doctor snips the brain stem and removes a dead baby.
 
 
 66
 These dramatic and distressing descriptions have obviously caused many citizens and thus many legislators to react with legislative attempts to ban the procedure. Courts have an obligation to construe these statutes narrowly to enable them to pass constitutional muster where possible. Whether this statute would hold up after all of the evidence is in remains to be seen on remand after further hearings on the motion for a permanent injunction. But at this stage I agree with the district court that the plaintiffs have not met the high burden required for a preliminary injunction, and I would thus affirm the court's denial.
 
 
 
 [1]
 Although this case involves a facial attack on a statute, neither side has addressed whether United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), which establishes that a statute must be unconstitutional under all circumstances to be facially invalid, applies in the abortion context. If Salerno does apply, then obviously the Act survives. The issue is pending before this court in a similar case brought under Illinois law. See Hope Clinic v. Ryan, 995 F.Supp. 847, 859 (N.D.Ill.1998), appeal docketed, No. 98-1726 (7th Cir. March 23, 1998). For purposes of this case, I assume that the "undue burden" test of Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and not the more stringent Salerno test, applies
 
 
 [2]
 There is no evidence in the record that any physician in Wisconsin, other than Dr. Christensen, performs the D & X procedure. And as the Supreme Court recently noted, the suggestion that an abortion regulation amounts to a substantial obstacle to abortion "is positively contradicted by the fact that only a single practitioner is affected." Mazurek v. Armstrong, 117 S.Ct. at 1867
 
 
 [3]
 This same language was recently quoted by the Supreme Court in Mazurek v. Armstrong, 117 S.Ct. at 1867. Casey addressed a state's requirement that a physician perform an abortion. But neither Casey nor subsequent Supreme Court precedent suggests that the state's broad latitude to regulate extends no further than the power to require a physician to perform the abortion. Casey also reconsidered the Court's earlier decision in Akron I, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), which (wrongly) held that a state could not require that a physician (as opposed to a qualified assistant) give the woman certain information about abortion. 505 U.S. at 882-83, 112 S.Ct. 2791. Mazurek, relying on Casey, held that a physician, and not a physician assistant, could similarly be required to perform the actual abortion. 117 S.Ct. at 1867-68
 
 
 [4]
 Similarly, the debate (in other sovereigns--Wisconsin has no death penalty) over various forms of execution, such as hanging, electrocution, the gas chamber, and lethal injection involves their respective cruelty, though their outcome is the same. See, e.g., Gray v. Lucas, 463 U.S. 1237, 104 S.Ct. 211, 77 L.Ed.2d 1453 (1983) (denial of certiorari) (Rehnquist, C.J., concurring; Marshall, J., dissenting)