In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2726

PLANNED PARENTHOOD OF WISCONSIN, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

J.B. VAN HOLLEN, Attorney General of Wisconsin, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cv-00465-wmc — **William M. Conley**, *Chief Judge*.

ARGUED DECEMBER 3, 2013 — DECIDED DECEMBER 20, 2013

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. On July 5 of this year, the Governor of Wisconsin signed into law a statute that the Wisconsin legislature had passed the previous month. So far as relates to this appeal, the statute prohibits a doctor, under threat of heavy penalties if he defies the prohibition, from performing an abortion (and in Wisconsin only doctors are allowed to perform abortions, Wis. Stat. § 940.15(5)) unless he has admitting privileges at a hospital no more than 30 miles from

the clinic in which the abortion is performed. Wis. Stat. § 253.095(2).

A doctor granted admitting privileges by a hospital becomes a member of the hospital's staff and is authorized to admit patients to that hospital and to treat them there; that is the meaning of "admitting privileges." Of course any doctor (in fact any person) can bring a patient to an emergency room to be treated by the doctors employed there (these days called "hospitalists"), and all Wisconsin abortion clinics already have transfer agreements with local hospitals to streamline the process. A hospital that has an emergency room is obliged to admit and to treat a patient requiring emergency care even if the patient is uninsured. 42 U.S.C. § 1395dd(b)(1).

Planned Parenthood of Wisconsin and Milwaukee Women's Medical Services (also known as Affiliated Medical Services)—the only entities that operate abortion clinics in Wisconsin—filed suit (joined by two physicians affiliated with these clinics, whom we'll largely ignore in an effort to simplify our opinion) challenging the constitutionality of the new statute under 42 U.S.C. § 1983, which provides a tort remedy for violations of federal law by state employees. The suit was filed promptly on July 5 and simultaneously with the filing the plaintiffs moved in the district court for a temporary restraining order. The court granted the motion on July 8 and later converted it to a preliminary injunction against enforcement of the statute pending a trial on the merits. The sparse evidentiary record ends on August 2, the day the preliminary injunction was granted. The defendants—the Attorney General of Wisconsin and other state officials involved in enforcing the statute (we refer to the de-

fendants collectively as the "state")—have appealed. 28 U.S.C. § 1292(a)(1).

Discovery is continuing in the district court, but the judge has stayed the trial (originally set for November 25) pending resolution of this appeal. The stay had been requested by the defendants, and in granting it the judge explained that "(1) the stay will not prejudice plaintiffs; and (2) a stay may simplify or clarify the issues in question and streamline the case for trial. Except for the lingering uncertainty (which will not be eliminated until this matter is resolved through final appeal), plaintiffs are not prejudiced by the stay now that an injunction is in place. As plaintiffs acknowledge, additional time may allow them to develop the record as to their ability to obtain admitting privileges at local hospitals. Furthermore, the Seventh Circuit's review of the preliminary injunction order will likely provide guidance to this court and the parties on the law and its application to the facts here. If anything, it would be inefficient for this court to address the merits of plaintiffs' claims until obtaining this guidance from the Seventh Circuit" (citations omitted).

All we decide today is whether the district judge was justified in entering the preliminary injunction. Evidence presented at trial may critically alter the facts found by the district judge on the basis of the incomplete record compiled in the first month of the suit, and recited by us.

Although signed into law on July 5, a Friday, the statute required compliance—the possession of admitting privileges at a hospital within a 30-mile radius of the clinic at which a doctor performs abortions—by July 8, the following Monday. So there was only the weekend between the governor's

signing the bill and the deadline for an abortion doctor to obtain those privileges. There was no way the deadline could have been met even if the two days hadn't been weekend days. It is unquestioned that it takes a minimum of two or three months to obtain admitting privileges (often a hospital's credentials committee, which decides whether to grant admitting privileges, meets only once a month), and often it takes considerably longer. Moreover, hospitals are permitted rather than required to grant such privileges.

All seven doctors in Wisconsin who perform abortions but as of July 8 did not have visiting privileges at a hospital within a 30-mile radius of their clinic applied for such privileges forthwith. But as of the date of oral argument of this appeal—five months after the law would have taken effect had it not been for the temporary restraining order—the application of one of the doctors had been denied and none of the other applications had been granted. Had enforcement of the statute not been stayed, two of the state's four abortion clinics—one in Appleton and one in Milwaukee—would have had to shut down because none of their doctors had admitting privileges at a hospital within the prescribed 30-mile radius of the clinics, and a third clinic would have lost the services of half its doctors. The impossibility of compliance with the statute even by doctors fully qualified for admitting privileges is a compelling reason for the preliminary injunction, albeit a reason that diminishes with time. There would be no quarrel with a one-year deadline for obtaining admitting privileges as distinct from a one-weekend deadline, and if so that might seem to argue for a one-year (or even somewhat shorter) duration for the preliminary injunction. But there should be no problem in getting the case to trial and judgment well before July 8, 2014. The plaintiffs are

ready to go to trial. The defendants contemplate very limited discovery. Furthermore there are more reasons for the preliminary injunction than just the impossibility of compliance with the statute within the deadline set by the statute.

The stated rationale of the Wisconsin law is to protect the health of women who have abortions. Most abortions—in Wisconsin 97 percent—are performed in clinics rather than in hospitals, and proponents of the law argue that if a woman requires hospitalization because of complications from an abortion she will get better continuity of care if the doctor who performed the abortion has admitting privileges at a nearby hospital. The plaintiffs disagree. They argue that the statute would do nothing to improve women's health—that its only effect would be to reduce abortions by requiring abortion doctors to jump through a new hoop: acquiring admitting privileges at a hospital within 30 miles of their clinic. No documentation of medical need for such a requirement was presented to the Wisconsin legislature when the bill that became the law was introduced on June 4 of this year. The legislative deliberations largely ignored the provision concerning admitting privileges, focusing instead on another provision—a requirement not challenged in this suit that a woman seeking an abortion obtain an ultrasound examination of her uterus first (if she hadn't done so already), which might induce her to change her mind about having an abortion. Wis. Stat. § 253.10(3)(c)(1)(gm).

No other procedure performed outside a hospital, even one as invasive as a surgical abortion (such as a colonoscopy, or various arthroscopic or laparoscopic procedures), and even if performed when the patient is under general anesthesia, and even though more than a quarter of all surgery in

the United States is now performed outside of hospitals, Ka-ren A. Cullen et al., "Ambulatory Surgery in the United States: 2006," *Centers for Disease Control and Prevention: National Health Statistics Reports* No. 11, Sept. 4, 2009, p. 5, www.cdc.gov/nchs/data/nhsr/nhsr011.pdf (visited Dec. 19, 2013, as were the other websites cited in this opinion), is required by Wisconsin law to be performed by doctors who have admitting privileges at hospitals within a specified, or indeed any, radius of the clinic at which the procedure is performed. That is true even for gynecological procedures such as diagnostic dilation and curettage (removal of tissue from the inside of the uterus), hysteroscopy (endoscopy of the uterus), and surgical completion of miscarriage (surgical removal of fetal tissue remaining in the uterus after a miscarriage, which is to say a spontaneous abortion), that are medically similar to and as dangerous as abortion—or so at least the plaintiffs argue, without contradiction by the defendants. These procedures, often performed by the same doctors who perform abortions, appear to be virtually indistinguishable from abortion from a medical standpoint.

An issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications. The rate of complications resulting in hospitalization from colonoscopies, for example, appears to be three to six times the rate of complications from abortions. Compare Cynthia W. Ko et al., "Serious Complications Within 30 Days of Screening and Surveillance Colonoscopy Are Uncommon," 8 *Clinical Gastroenterology & Hepatology* 166, 171–72 (2010), with two studies cited in an amicus curiae brief filed by the American College of Ob-

stetricians and Gynecologists, Tracy A. Weitz et al., "Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver," 103 *Am. J. Public Health* 454, 457–58 (2013), and Kelly Cleland et al., "Significant Adverse Events and Outcomes After Medical Abortions," 121 *Obstetrics & Gynecology* 166, 169 (2013). Wisconsin's annual report on abortions suggests a higher incidence of complications but it is unclear whether they all require hospitalization and it still is lower than the reported incidence of complications from colonoscopies. Wisconsin Department of Health Services, "Reported Induced Abortions in Wisconsin, 2012" (Aug 2013), www.dhs.wisconsin.gov/publications/p4/p45360-12.pdf. It is possible that because of widespread disapproval of abortion, abortions and their complications may be underreported—some women who experience such complications and are hospitalized may tell the hospital staff that the complications are from a miscarriage. But as yet there is no evidence in the record of such undercounting. The state's own report on abortions, just cited, lists (at table 9 of the report) only 11 complications out of the 6,692 abortions of Wisconsin residents reported in 2012—a rate of less than 1.6 tenths of 1 percent (1 per 608 abortions). And the report does not indicate how many of the complications involved hospitalization or whether 6,692 was an undercount of the number of abortions.

We asked the state's lawyer at oral argument what evidence he anticipated producing at the trial on the merits. He did not mention evidence of alleged undercounting of abortions, but only that the state was looking for women in Wisconsin who had experienced complications from an abortion to testify. He did not mention any medical or statistical evi-

dence. This may explain why the trial, originally scheduled for November 25, only four and a half months after the suit was filed, was expected to last only a couple of days. And it is why we think it most unlikely that the trial can't be completed well before the one-year anniversary of the date of the statute's enactment.

The district judge said in a footnote in his opinion that while he would "await trial on the issue, … the complete absence of an admitting privileges requirement for clinical [i.e., outpatient] procedures including for those with greater risk is certainly evidence that Wisconsin Legislature's only *purpose* in its enactment was to restrict the availability of safe, legal abortion in this State, particularly given the lack of any demonstrable medical benefit for its requirement either presented to the Legislature or [to] this court" (emphasis in original). A fuller enumeration of considerations based on purpose would include the two-day deadline for obtaining admitting privileges, the apparent absence of any medical benefit from requiring doctors who perform abortions to have such privileges at a nearby or even any hospital, the differential treatment of abortion vis-à-vis medical procedures that are at least as dangerous as abortions and probably more so, and finally the strange private civil remedy for violations: The father or grandparent of the "aborted unborn child" is entitled to obtain damages, including for emotional and psychological distress, if the abortion was performed by a doctor who violated the admitting-privileges provision. Wis. Stat. § 253.095(4)(a). Yet if the law is aimed *only* at protecting the mother's health, a violation of the law could harm the fetus's father or grandparent only if the mother were injured as a result of her abortion doctor's lacking the required admitting privileges. But no proof of such injury is required

to entitle the father or grandparent to damages if he proves a violation and resulting emotional or psychological injury to himself.

However, the purpose of the statute is not at issue in this appeal. In urging affirmance the plaintiffs reserve the issue for trial, arguing to us only that the law discourages abortions without medical justification and imposes an undue burden on women. And the state on its side does not defend the statute as protecting fetal life but only as protecting the health of women who have abortions.

Wisconsin's statute is not unique. Six states have laws nearly identical to Wisconsin's: Ala. Code § 26-23E-4; Miss. Code. § 41-75-1(f); Mo. Stat. § 188.080; N.D. Cent. Code § 14-02.1-04(1); Tenn. Code § 39-15-202(h); Tex. Health & Safety Code § 171.0031(a)(1). Five more have similar though less stringent requirements relating to admitting privileges for abortion doctors: Ariz. Rev. Stat. § 36-449.03(C)(3); Fla. Stat. § 390.012(3)(c)(1); Ind. Code § 16-34-2-4.5; Kan. Stat. § 65-4a09(d)(3); Utah Admin. Code R432-600-13(2)(a). The plaintiffs argue that such laws, which are advocated by the right to life movement, are intended to hamstring abortion. The defendants deny this. We needn't take sides. Discovering the intent behind a statute is difficult at best because of the collective character of a legislature, and may be impossible with regard to the admitting-privileges statutes. Some Wisconsin legislators doubtless voted for the statute in the hope that it would reduce the abortion rate, but others may have voted for it because they considered it a first step toward making invasive outpatient procedures in general safer.

As now appears (the trial may cast the facts in a different light), the statute, whatever the intent behind it (if there is a

single intent), seems bound to have a substantial impact on the practical availability of abortion in Wisconsin, and not only because of the unreasonably tight implementation deadline. Virtually all abortions in Wisconsin are performed at the plaintiffs' four clinics; no other clinics in the state perform abortions and hospitals perform only a small fraction of the state's abortions; and a significant fraction of the clinics' doctors don't have admitting privileges at hospitals within 30-mile radii of their clinics.

What is more, because few doctors in Wisconsin perform abortions, those who do often work at more than one clinic, so that the statute would require them to obtain admitting privileges at multiple hospitals. And whether any of the hospitals would give these doctors admitting privileges is unknown. It is true that federal law prohibits hospitals that receive federal funding, including Catholic hospitals, from denying admitting privileges merely because a doctor performs abortions. 42 U.S.C. § 300a-7(c)(1)(B) (the "Church Amendments"). Yet Wisconsin State Senator Mary Lazich, one of the authors of the admitting-privileges law, was seemingly unaware of the Church Amendments, as were indeed officials of the largest Catholic hospitals in Wisconsin, which before they were informed of the amendments were emphatic that their religious beliefs would preclude their granting admitting privileges to doctors who perform abortions. Akbar Ahmed, "Abortion Ruling Mired in Confusion," *Milwaukee Journal Sentinel*, July 27, 2013, p. A1, www.jsonline.com/news/statepolitics/court-file-shows-confusion-over-wisconsin-abortion-regulation-law-b9961373z1-217196251.html#ixzz2mcyeJ5ba. In the words of the chief medical officer of one such hospital, "Wheaton Franciscan Healthcare is a ministry of the Catholic church.

… For that reason, if it's known to us that a doctor performs abortions and that doctor applies for privileges at one of our hospitals, our hospital board would not grant privileges." *Id.*

So not only would allowing the new law to go into effect on July 8 have wreaked havoc with the provision of abortions in Wisconsin because of the months it would have taken for the doctors who perform abortions to obtain admitting privileges within the prescribed radii of their clinics; in addition their requests for such privileges would have encountered resistance at Catholic hospitals—and perhaps at other hospitals as well, given the widespread hostility to abortion and the lack of any likely benefit to a hospital from granting such privileges to an abortion doctor.

The criteria for granting admitting privileges are multiple, various, and unweighted. They include how frequently the physician uses the hospital (that is, the number of patient admissions), the quantity of services provided to the patient at the hospital, the revenue generated by the physician's patient admissions, and the physician's membership in a particular practice group or academic faculty ("closed staff" arrangements). Barry R. Furrow et al., *Health Law* § 14-15, pp. 707–08 (2d ed. 2000); Elizabeth A. Weeks, "The New Economic Credentialing: Protecting Hospitals from Competition by Medical Staff Members," 36 *J. Health L.* 247, 249–52 (2003). The absence of definite standards for the granting of admitting privileges makes it difficult not only to predict who will be granted such privileges at what hospitals and when, but also to prove an improper motive for denial. Akbar Ahmed, "Hospitals Can't Deny Privileges," *Milwaukee Journal Sentinel*, Aug. 7, 2013, p. A1, www.jsonline.com/news/statepolitics/wisconsin-attorney-general-says-hospitals-cant-

deny-admitting-privileges-to-abortion-doctors-b997046-
218608951.html, points out for example that according to the
Senior Counsel of the National Women's Law Center, "in
other states that have recently passed privileges require-
ments for abortion providers, religiously affiliated hospitals
have denied the doctors' applications by citing their failure
to meet other standards, such as admitting a certain number
of patients per year. In Mississippi, a Baptist hospital did not
provide doctors at an abortion clinic with an application for
privileges because none of its staff would write letters in
support of the doctors, according to a court affidavit provid-
ed by the clinic's attorneys at the Center for Reproductive
Rights."

Pretext aside, a common and lawful criterion for granting
admitting privileges (though it has been criticized by the
American Medical Association, see AMA, "Opinion 4.07—
Staff  Privileges,"  www.ama-assn.org/ama/pub/physician-
resources/medical-ethics/code-medical-ethics/
opinion407.page) is the number of patient admissions a doc-
tor can be expected to produce for the hospital—the more
the better, as that means more utilization of hospital em-
ployees and resources and hence more fees for the hospital.
But the number of patient admissions by doctors who per-
form abortions is likely to be negligible because there appear
to be so few complications from abortions and only a frac-
tion of those require hospitalization—probably a very small
fraction. An even smaller fraction will still be near the hospi-
tal at which the doctor has admitting privileges when the
complication arises. The state does not dispute the district
court's finding that "up to half of the complications will not
present themselves until after the patient is home."

But what is certain and also not disputed by the state is that banning abortions by doctors who cannot obtain the requisite admitting privileges within the span of a weekend is bound to impede access to abortions. It would have created (had it not been for judicial intervention) a hiatus of unknown duration (but duration measured in months rather than in weeks or days) in which a critical number of the few doctors who perform abortions in Wisconsin would have been forbidden to do so, under threat of heavy penalties if they disobeyed.

There cannot have been a felt sense of urgency on the state's part for making the law effective too abruptly to allow compliance with it. It has been 40 years since *Roe v. Wade*, 410 U.S. 113 (1973), was decided, legalizing (most) abortion throughout the United States, and it could not have taken the State of Wisconsin all this time to discover the supposed hazards of abortions performed by doctors who do not have admitting privileges at a nearby hospital. The state can without harm to its legitimate interests wait a few months more to implement its new law, should it prevail in this litigation.

One reason it can wait is that its expressed concern about the hazards resulting from abortions performed by doctors who don't have admitting privileges at a nearby hospital has intersected a movement in the hospital industry (an industry in ferment, as everyone now knows) to restrict admitting privileges on economic grounds. See Weeks, *supra*, at 248–49, 252–53 ("for example, hospitals may refuse to grant initial or continuing staff privileges to physicians who own or have other financial interests in competing healthcare entities, refer patients to competing entities, have staff privileges at any

other area hospitals, or fail to admit some specified percentage of their patients to the hospital"); Peter J. Hammer & William M. Sage, "Antitrust, Health Care Quality, and the Courts," 102 *Colum. L. Rev.* 545, 567–68 and n. 58 (2002). The trend in the hospital industry is for the hospital to require the treating physician to hand over his patient who requires hospitalization to physicians employed by the hospital, rather than allowing the treating physician to continue participating in the patient's treatment in the hospital. Wisconsin is trying to buck that trend—but only with regard to abortions, though there is no evidence that the complications to which abortion can give rise require greater physician continuity than other outpatient procedures. And there is no evidence that women who have complications from an abortion recover more quickly or more completely or with less pain or discomfort if their physician has admitting privileges at the hospital to which the patient is taken for treatment of the complications.

The state devotes most of its briefing in this court not to the merits but instead to arguing that the plaintiffs cannot be allowed to maintain this suit because *their* rights have not been violated. The state does not deny that they may be injured by the statute. But it argues that no rights of theirs have been violated but only rights of their patients, if it is true (which of course the defendants deny) that the statute is a gratuitous interference with a woman's right to an abortion.

Yet the cases are legion that allow an abortion provider, such as Planned Parenthood of Wisconsin or Milwaukee Women's Medical Services, to sue to enjoin as violations of federal law (hence litigable under 42 U.S.C. § 1983) state

laws that restrict abortion. See, e.g., *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013) ("recognizing the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy, the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients"); Richard H. Fallon, Jr., "As-Applied and Facial Challenges and Third-Party Standing," 113 *Harv. L. Rev.* 1321, 1359–61 (2000). The reason for allowing such third-party standing in the present case is different from but analogous to the reason that persuaded the Supreme Court, beginning with *Roe v. Wade*, to waive the mootness defense to a suit by a pregnant woman challenging a state law restricting abortion. The suit could not be litigated to judgment before she gave birth; and so if mootness were allowed as a defense, restrictions on abortion could not effectively be challenged by the persons whose rights the restrictions infringe. That was a practical bar to insisting on first-party standing. The bar in this case is the extraordinary heterogeneity of the class likely to be affected by the statute. If two of the four abortion clinics in the state close and a third shrinks by half, some women wanting an abortion may experience delay in obtaining, or even be unable to obtain, an abortion yet not realize that the new law is likely to have been the cause. Those women are unlikely to sue. Other women may be able to find an abortion doctor who has admitting privileges at a nearby hospital, yet incur costs and delay because the law has reduced the number of abortion doctors and hence access. The heterogeneity of the class is likely to preclude class action treatment; and while one or a

handful of women might sue, the entire statute would be un-likely to be enjoined on the basis of such a suit.

The principal objection to third-party standing is that it wrests control of the lawsuit from the person or persons primarily concerned in it. See, e.g., *MainStreet Organization of Realtors v. Calumet City*, 505 F.3d 742, 746 (7th Cir. 2007); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.9.3, pp. 720–26 (3d ed. 2008). For an extreme example, imagine that if A broke his contract with B, a stranger to both of them could sue A for breach of contract, leaving B out in the cold. But that is not a problem in a case such as this. Wisconsin women who have or want to have an abortion are not seeking damages from the state, and so are not losing control over their legal rights as a result of litigation by clinics and doctors. They are (or would be, if they were plaintiffs) seeking the same thing the clinics are seeking (with greater resources): invalidating the statute.

Anyway there is an alternative ground for standing, un-related to third-party standing, in this case. The Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (the companion case to *Roe v. Wade*), that doctors (two of the plaintiffs in this case are doctors) have first-party standing to challenge laws limiting abortion when, as in *Doe v. Bolton* and the present case as well, see Wis. Stat. §§ 253.095(3), (4), penalties for violation of the laws are visited on the doctors. See also *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 903–04, 909 (1992); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976); *Karlin v. Foust*, 188 F.3d 446, 456 n. 5 (7th Cir. 1999); *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 465 (7th Cir.

1998); 13A Wright, Miller & Cooper, *supra*, pp. 748–50. The state argues that none of these precedents governs because none of them "grapple[d] with whether [42 U.S.C.] § 1983 creates a cause of action for abortion providers or clinics to assert the rights of their patients." But nearly all the cited cases in which doctors and abortion clinics were found to have had standing had been filed pursuant to section 1983, and the justiciability of such cases is not in question.

Apart from the issue of standing just discussed, the legal principles applicable to our consideration of the appeal are not in contention between the parties. The task of the district court asked to grant a preliminary injunction is "to estimate the likelihood that the plaintiff will prevail in a full trial and which of the parties is likely to be harmed more by a ruling, granting or denying a preliminary injunction, in favor of the other party, and combine these findings in the manner suggested in such cases as *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992): 'the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.'" *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013); see also *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996); *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (per curiam); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1028–29 (10th Cir. 2004) (en banc) (per curiam), affirmed, 546 U.S. 418 (2006); *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 597 (3d Cir. 2002). This formulation is a variant of, though consistent with, the Supreme Court's recent formulations of the stand-

ard, in such cases as *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

Because of the uncertainty involved in balancing the considerations that bear on the decision whether to grant a preliminary injunction—an uncertainty amplified by the unavoidable haste with which the district judge must strike the balance—we appellate judges review his decision deferentially.

The state concedes that its only interest pertinent to this case is in the health of women who obtain abortions. But it has neither presented evidence of a health benefit (beyond an inconclusive affidavit by one doctor concerning one abortion patient in another state, as we'll see), or rebutted the plaintiffs' evidence that the statute if upheld will harm abortion providers and their clients and potential clients.

And it is beyond dispute that the plaintiffs face greater harm irreparable by the entry of a final judgment in their favor than the irreparable harm that the state faces if the implementation of its statute is delayed. For if forced to comply with the statute, only later to be vindicated when a final judgment is entered, the plaintiffs will incur in the interim the disruption of the services that the abortion clinics provide. With the closure of two and a half of the state's four abortion clinics if their doctors fail to obtain admitting privileges, including one clinic responsible for half the abortions performed in the state, their doctors' practices will be shut

down completely unless and until the doctors obtain visiting privileges at nearby hospitals. Patients will be subjected to weeks of delay because of the sudden shortage of eligible doctors—and delay in obtaining an abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal.

Some patients will be unable to afford the longer trips they'll have to make to obtain an abortion when the clinics near them shut down—60 percent of the clinics' patients have incomes below the federal poverty line. One of the clinics that will close is Planned Parenthood's clinic in Appleton, which, as shown in the accompanying map, is in the approximate center of the state. The remaining abortion clinics are in Madison or Milwaukee, about 100 miles south of Appleton. A woman who lives north of Appleton who wants an abortion may (unless she lives close to the Minnesota border with Wisconsin and not far from an abortion clinic in that state) have to travel up to an additional 100 miles each way to obtain it. And that is really 400 miles—a nontrivial burden on the financially strapped and others who have difficulty traveling long distances to obtain an abortion, such as those who already have children. For Wisconsin law requires two trips to the abortion clinic (the first for counseling and an ultrasound) with at least twenty-four hours between them. Wis. Stat. § 253.10(3)(c). When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered.



The state has made no attempt to show an offsetting harm from a delay of a few months in the implementation of its new law (should it be upheld after a trial). States that have passed similar laws have allowed much longer implementation time than a weekend—for example, Mississippi has allowed 76 days, Alabama 114 days, Texas 103, and North Dakota 128. See 2012 Miss. Gen. Laws 331 (H.B. 1390), enjoined, *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013); 2013 Ala. Legis. Serv. 2013-79 (H.B. 57), enjoined, *Planned Parenthood Southeast, Inc. v. Bentley*, No. 2:13cv405-MHT, 2013 WL 3287109, at *8 (M.D. Ala. June 28, 2013); 2013 Tex. Sess. Law Serv. 2nd Called Sess. Ch.

1 (H.B. 2), permanent injunction stayed pending appeal, *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 734 F.3d 406 (5th Cir. 2013); 2013 North Dakota Laws Ch. 118 (S.B. 2305), enjoined, *MKB Management Corp. v. Burdick*, No. 1:13-cv-071, 2013 WL 3779740, at *2 (D.N.D. July 22, 2013).

Is there such urgency to implementing the law, because Wisconsin is rife with serious complications from abortion and requiring admitting privileges to hospitals within short distances of abortion clinics is essential to preventing such complications? As noted earlier, the state has presented no evidence of either reason for the weekend deadline. Complications of abortion are estimated to occur in only one out of 111 physician-performed aspiration abortions (the most common type of surgical abortion); and 96 percent of complications are "minor." Weitz et al., *supra*, p. 457; cf. Cleland et al., *supra*. The official Wisconsin figure, cited earlier, is much lower: one complication per 608 abortions. Few complications require hospitalization; studies cited earlier found that only 1 in 1,915 aspiration abortions (0.05%) and 1 in 1,732 medical abortions (0.06%) result in complications requiring hospitalization. Weitz et al., *supra*, p. 459; Cleland et al., *supra*, p. 169 table 2.

What fraction of these hospitalizations go awry because the doctor who performed the abortion did not have admitting privileges at the hospital to which the woman was taken is another unknown in a case in which thus far the state has been chary in the presentation of evidence. True, one doctor, who said he's been treating complications from abortions for 29 years, furnished the defendants with an affidavit describing a case in which, he opines, a woman with a complication

from an abortion *might* have avoided a hysterectomy had her abortion doctor, who did not have admitting privileges, remained in closer touch with her. That is the only evidence in the record that any woman whose abortion results in complications has ever, anywhere in the United States, been made worse off by being "handed over" by her abortion doctor to a gynecologist employed by the hospital to which she's taken. One (doubtful) case in 29 years is not impressive evidence of the medical benefits of the Wisconsin statute. And we note that as a protection for Wisconsin women who have abortions, abortion clinics—uniquely, it appears, among outpatient providers of medical services in Wisconsin—are required to adopt the transfer protocols, mentioned earlier, which are intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization. See Wis. Admin. Code Med. § 11.04(g).

The defendants argue that obtaining admitting privileges operates as a kind of Good Housekeeping Seal of Approval of a physician. But that benefit does not require that the hospital in which he obtains the privileges be within a 30-mile radius of the clinic. Cf. *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377, 1378–81 (8th Cir. 1989) (upholding an admitting privileges requirement with no geographic restriction). Several abortion doctors in Wisconsin who lack admitting privileges at hospitals within 30 miles have them at hospitals beyond that radius. Yet they are not excused by the statute from having to obtain the same privileges from a hospital within 30 miles.

Furthermore, nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient

who has complications from an abortion. He doesn't have to accompany her to the hospital, treat her there, visit her, call her, or indeed do anything that a doctor employed by the hospital might not do for the patient.

Also the statute does not distinguish between surgical and medical abortions. The latter term refers to an abortion induced by a pill given to the patient by her doctor: she takes one pill in the clinic, goes home, and takes a second pill a few days later to complete the procedure. (The first pill ends the fetus's life, the second induces the uterus to expel the remains.) Her home may be far from any hospital within a 30-mile radius of her doctor's clinic, but close to a hospital outside that radius. If she calls an ambulance, the paramedics are likely to take her to the nearest hospital—a hospital at which her doctor is unlikely to have admitting privileges. Likewise in the case of surgical abortions when complications occur not at the clinic, during or immediately after the abortion, but after the patient has returned home: because of distance she may no longer have ready access to the hospitals near the clinic at which the abortion was performed, even though she may live near a hospital at which the doctor who performed her abortion does not have admitting privileges.

The cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose an "undue burden" on women seeking abortions. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, *supra*, 505 U.S. at 874, 877, 900–01 (plurality opinion); *Stenberg v. Carhart*, 530 U.S. 914, 930, 938 (2000); cf. *Mazurek v. Armstrong*, 520 U.S. 968, 972–73

(1997) (per curiam). The feebler the medical grounds, the likelier the burden, even if slight, to be "undue" in the sense of disproportionate or gratuitous. It is not a matter of the number of women likely to be affected. "[A]n undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Planned Parenthood of Southeastern Pennsylvania v. Casey*, *supra*, 505 U.S. at 877 (plurality opinion). In this case the medical grounds thus far presented ("thus far" being an important qualification given the procedural setting—a preliminary-injunction proceeding) are feeble, yet the burden great because of the state's refusal to have permitted abortion providers a reasonable time within which to comply.

And so the district judge's grant of the injunction must be upheld. But given the technical character of the evidence likely to figure in the trial—both evidence strictly medical and evidence statistical in character concerning the consequences both for the safety of abortions and the availability of abortion in Wisconsin—the district judge may want to reconsider appointing a neutral medical expert to testify at the trial, as authorized by Fed. R. Evid. 706, despite the parties' earlier objections. Given the passions that swirl about abortion rights and their limitations there is a danger that party experts will have strong biases, clouding their judgment. They will still be allowed to testify if they survive a *Daubert* challenge, but a court-appointed expert may help the judge to resolve the clash of the warring party experts. And the judge may be able to procure a genuine neutral expert simply by directing the party experts to confer and agree on two or three qualified neutrals among whom the judge can choose with confidence in their competence and neutrality.

If either side's party experts stonewall in the negotiations for the compilation of the neutral list, the judge can take disciplinary action; we doubt that will be necessary.

We emphasize in conclusion that the trial on the merits may cast the facts we have recited, based as they are on the record (by no means slim, however, though entirely documentary) of the preliminary-injunction proceeding, in a different light. That record—all we have—requires that the district judge's grant of the preliminary injunction be, and it hereby is,

AFFIRMED.

MANION, *Circuit Judge,* concurring in part and in the judgment.

I agree with the court that the temporary restraining order and the subsequent preliminary injunction were appropriate. The Wisconsin law at issue requires abortion doctors to obtain admitting privileges at a hospital no more than 30 miles from the clinic in which the abortion is performed. 2013 Wis. Act 37, § 1 (codified at Wis. Stat. § 253.095(2)). As I explain below, the legislature had a rational basis to enact the law. However, the law was signed by the governor on a Friday and took effect the following Monday. The law's immediate effective date made it impossible for the doctors employed at the various clinics providing abortion services to seek and obtain admitting privileges at a nearby hospital. The injunctive relief has now been in place for nearly half a year, so abortion doctors have had plenty of time to secure admitting privileges. However, in this appeal, Wisconsin has only argued that the original entry of the injunction was error, so whether the injunction *remains* appropriate will be decided on remand. I also agree with the court about third-party standing. There is no need for the parties to dwell on this issue.

As the court notes, at this juncture, "the Seventh Circuit's review of the preliminary injunction order will likely provide guidance to the court and the parties on the law and its application to the facts here." Maj. Op. at 3. The court has expressed rather extensive guidance for the district court on remand. At this point, I hope to offer some of my own observations on the legitimate interests that are furthered by the requirements of Wisconsin Act 37 and the nature of the

burdens that the requirements may impose on access to abortion.

## The Two-Part Test for Laws Regulating the Provision of Abortions

"Where it has a rational basis to act, and it does not impose an undue burden, the State may" regulate the provision of abortions. *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007). Thus, legislation regulating abortions must past muster under rational basis review *and* must not have the "practical effect of imposing an undue burden" on the ability of women to obtain abortions. *See Karlin v. Foust*, 188 F.3d 446, 481 (7th Cir. 1999); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 411 (5th Cir. 2013), application to vacate stay of injunction denied, 134 S. Ct. 506 (Nov. 19, 2013).

### Step 1: Rational Basis

At the first step, we must presume that the admitting-privileges requirement is constitutional, and uphold it so long as the requirement is rationally related to Wisconsin's legitimate interests. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 637–38 (7th Cir. 2007) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Wisconsin asserts that its admitting-privileges requirement furthers its legitimate interests in protecting the health of mothers and in maintaining the professional standards applicable to abortion doctors. *Carhart*, 550 U.S. at 157; *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992). The question, then, is whether Wisconsin's adoption of the admitting-privileges requirement is rationally related to these interests. "Under rational basis review, 'the plaintiff has the

burden of proving the government's action irrational,' and "[t]he government may defend the rationality of its action on any ground it can muster, not just the one articulated at the time of decision.'" *RJB Props., Inc. v. Bd. of Educ. of Chicago*, 468 F.3d 1005, 1010 (7th Cir. 2006) (quoting *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006)).

The court suggests that Wisconsin must come forward with medical evidence that the admitting-privileges requirement furthers the State's legitimate interests. Maj. Op. at 23. But, under rational basis review, Wisconsin's legislative choice "may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). States have "broad latitude" to regulate abortion doctors, "even if an objective assessment might suggest that" the regulation is not medically necessary. *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (quotation marks and emphasis omitted). Thus, the Supreme Court has rejected as misguided arguments that an abortion law is unconstitutional because the medical evidence contradicts the claim that the law has any medical basis. *Id.*; *see also Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 169 (4th Cir. 2000) ("[T]here is no requirement that a state refrain from regulating abortion facilities until a public-health problem manifests itself. In *Danforth*, for example, the [Supreme] Court upheld health measures that 'may be helpful' and 'can be useful.'" (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 80–81 (1976))). In sum, Wisconsin need offer only "a 'conceivable state of facts that could provide a rational basis' for requiring abortion physicians to have hospital admission privileges." *Abbott*, 734 F.3d at 411 (quoting *F.C.C.*, 508 U.S. at 313).

*The Medical Professions' Support for Admitting Privileges*

In 2003, the American College of Surgeons issued a statement on patient-safety principles that reflected a consensus in the surgical community "on a set of 10 core principles that states should examine when moving to regulate office-based procedures."[1] These principles were based on a document that was unanimously agreed to by medical associations of every stripe, including the American Medical Association and the American College of Obstetricians and Gynecologists. Core Principle #4 provides that "[p]hysicians performing office-based surgery must have admitting privileges at a nearby hospital, a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital." Unsurprisingly, the National Abortion Federation has specifically recommended that "[i]n the case of emergency, the doctor should be able to admit patients to a nearby hospital (no more than 20 minutes away)." National Abortion Federation, *Having an Abortion? Your Guide to Good Care* (2000) (pamphlet), available at http://web.archive.org/web/20000619200916/http://www.prochoice.org/pregnant/goodcare.htm (internet archive of NAF website on June 19, 2000) (hereinafter, "*NAF Guide to Good Care*"). This should be sufficient to establish that Wiscon-

---

[1] *See* American College of Surgeons, *Statement on Patient Safety Principles for Office-based Surgery Utilizing Moderate Sedation/Analgesia, Deep Sedation/Analgesia, or General Anesthesia*, Bulletin of the American College of Surgeons, Vol. 89, No. 4 (Apr. 2004), available at http://www.facs.org/fellows_info/statements/st-46.html (last visited on Dec. 12, 2013, as were the other websites cited in this opinion).

sin's admitting-privileges requirement is reasonably designed to promote the state's legitimate interest in women's health. And, as the court recognizes, Wisconsin is one of twelve states adopting such a requirement. Maj. Op. at 9.

*The Benefits of Admitting Privileges in an Emergency Situation*

Further, the parties agree that at least a small number of abortions result in complications that require hospitalization.[2] Wisconsin offers doctors' declarations establishing that the admitting-privileges requirement expedites the admission process and avoids mis-communications between the patient and the hospital in situations where swift treatment is critical. *See* J.A. 149–50, ¶¶ 12–19 (Decl. of Dr. James Anderson); 175–76, ¶ 14 (Decl. of Dr. Matthew Lee); 184, ¶ 9 (Decl. of Dr. Linn); 237–38, ¶¶ 6–12 (Decl. of Dr. David C. Merrill); 332–33, ¶¶ 25–31 (Decl. of Dr. John Thorp); *see also* Darrell J. Solet, MD, et al., *Lost in Translation: Challenges and Opportunities to Physician-to-Physician Communication During Patient Handoffs*, 80 Academic Medicine 1094, 1097 (Dec. 2005) (observing, in the

---

[2] The exact percentage is in dispute, but at least .3% of abortions result in complications requiring hospitalization. In Wisconsin, this amounts to a woman requiring hospitalization as a result of an abortion or attempted abortion every 16 days. As the court recognizes, however, this percentage is likely artificially low due to under-reporting. Maj. Op. at 7. When a woman is admitted to a hospital without a request for admission from an abortion doctor, the social stigmas associated with abortion will likely cause her to report her complications as arising from a miscarriage or other mishap rather than a botched abortion. *See also Abbott*, 734 F.3d at 412 (quoting Dr. John Thorp regarding "the 'unique nature of an elective pregnancy termination and its likely under-reported morbidity and mortality'"); J.A. 183, ¶ 6 & n.1 (Decl. of Dr. Linn).

context of patient transfers, that "poor communication in medical practice turns out to be one of the most common causes of error"). After all, the abortion doctor is better acquainted with his patient's medical history and is in a better position to quickly diagnose complications resulting from the procedure. *See* J.A. 238, ¶ 12 (Decl. of Dr. Merrill); 332, ¶ 25 (Decl. of Dr. Thorp). Additionally, the admitting-privileges requirement ensures "that a physician will have the authority to admit his patient into a hospital whose resources and facilities are familiar to him … ." *Women's Health Ctr. of W. Cnty., Inc. v. Webster*, 871 F.2d 1377, 1381 (8th Cir. 1989) (quotation marks omitted).

*The Oversight Function of the Admitting-Privileges Requirement*

Moreover, "[t]he requirement that physicians performing abortions must have hospital admitting privileges helps to ensure that credentialing of physicians beyond initial licensing and periodic license renewal occurs."[3] *Abbott*, 734 F.3d at 411. Thus, Wisconsin's admitting-privileges requirement adds an extra layer of protection for *all* of the patients of abortion

---

[3] The court expresses doubts about this justification because Wisconsin requires that the hospital be within 30 miles of the clinic at which the doctor performs the abortions. "Under rational basis review, however, the [selected means] need not be the most narrowly tailored means available to achieve the desired end." *Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir. 1997); *see also* American College of Surgeons, *supra* note 1 ("Physicians performing office-based surgery must have admitting privileges at a *nearby* hospital, a transfer agreement with another physician who has admitting privileges at a *nearby* hospital, or maintain an emergency transfer agreement with a *nearby* hospital.") (emphasis added); *NAF Guide to Good Care* (recommending admitting privileges at a hospital "no more than 20 minutes away").

doctors. Indeed, every circuit to address the issue has held that admitting-privileges requirements further states' legitimate interests. *Abbott*, 734 F.3d at 412 ("We have little difficulty in concluding that, with regard to the district court's rational basis determination, the State has made a strong showing that it is likely to prevail on the merits."); *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envtl. Control,* 317 F.3d 357, 363 (4th Cir. 2002) ("These requirements of having admitting privileges at local hospitals and referral arrangements with local experts are so obviously beneficial to patients."); *Webster,* 871 F.2d at 1381 (Missouri's admitting-privileges requirement "furthers important state health objectives.").

*Admitting Privileges and Other Outpatient Surgeries*

The court emphasizes the fact that Wisconsin has not imposed an admitting-privileges requirement on doctors who perform outpatient procedures other than abortion. But the plaintiffs bear the burden of proof and have offered no evidence that doctors in those other fields have a lack of admitting privileges—as do abortion doctors—which would necessitate a legislative response. Moreover, there is no mandate that state legislatures uniformly regulate medical procedures—or regulate medical procedures with higher or even the highest incidents of complications. States "may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955). Finally, Wisconsin had a perfectly good reason for addressing abortion first—namely, the Gosnell scandal.

*The Dr. Kermit Gosnell Scandal*

There has been no high-profile exposure of substandard care by doctors who perform outpatient procedures other than abortion. However, just a few weeks prior to the enactment of Wisconsin's admitting-privileges requirement, there was a shocking revelation of terrible conditions and procedures at an abortion clinic that received nationwide attention. On May 13, 2013, a Philadelphia abortion doctor, Dr. Kermit Gosnell, was convicted of three counts of first-degree murder for the death of three infants delivered alive but subsequently killed at his clinic. The record in this appeal contains articles extensively discussing the egregious health care practices at Dr. Gosnell's clinic leading up to his conviction. These include bloody floors and unlicensed employees conducting gynecological examinations and administering painkillers, resulting in the death of a patient. *See* J.A. 154 (Joann Loviglio, *Abortion Doctor Suspended After Philadelphia Raid: 'Deplorable' Conditions Reported At Kermit Gosnell's Office*, The Huffington Post, Feb. 23, 2010, http://www.huffingtonpost.com/2010/02/23/abortion-doctor-suspended_n_473963.html). In addition, media reports circulated that, among other things, Dr. Gosnell physically assaulted and performed a forced abortion on a minor and left fetal remains in a woman's uterus causing her excruciating pain.[4] Although these details were first publicized after Dr. Gosnell's arrest in 2011, the case did not garner national

---

[4] Jessica Hopper, *Alleged Victim Calls Philadelphia Abortion Doc Kermit Gosnell a 'Monster'*, ABC News, Jan. 25, 2011, http://abcnews.go.com/US/alleged-victim-calls-philadelphia-abortion-doctor-kermit-gosnell/story?id=12731387&singlePage=true

attention until his trial in March 2013. Unsurprisingly, the case provoked shock and outrage, prompting a heightened concern for the health of women seeking abortions. In addition to Dr. Gosnell's case, Wisconsin identifies numerous other examples of egregious and substandard care by abortion providers and clinics. *See* Appendix to the Concurrence; J.A. 154–56.

On June 4, 2013, Wisconsin Act 37, which contained the admitting-privileges requirement at issue in this appeal and also contained an ultrasound requirement, was introduced in the Wisconsin Senate. On June 12, the Act passed in the Senate. On June 13, the Act passed in the Assembly, where it was returned to the Senate and presented to the governor for his signature on July 3. On July 5, the Act was signed into law by the governor. This timeline demonstrates that Wisconsin legislators promptly responded to their constituents' concerns. Wisconsin Act 37 was a response to the dangers (graphically illustrated by Dr. Gosnell's case) to women's health and the right to freely exercise their choice.

### The Interaction Between the Act's Admitting-Privileges and Ultrasound Requirements

In addition, the admitting-privileges requirement furthers the Act's ultrasound requirement. *See* Wis. Stat. § 253.10(3)(c). Performing an ultrasound allows an abortion doctor to get a clear picture of the woman's pregnancy—including the gestational age and size of the unborn child, whether there are twins, whether the heart is beating,[5] and the orientation of the

---

[5] Detecting a heartbeat enables the abortion doctor to determine whether

(continued...)

unborn child within the uterus—which allows the doctor to anticipate any likely complications. The law requires that, absent an emergency, the woman receive an ultrasound at the clinic or elsewhere. Accordingly, regardless of where the ultrasound is performed, important and easily determinable facts about the pregnancy are available to the abortion doctor. Additionally, the ultrasound must be explained to the woman so that she can exercise her right to choose while fully informed.[6] These benefits conferred by the ultrasound require

---

[5] (...continued)

the unborn child is still alive—a serious concern in light of the prevalence of miscarriages. *See* National Institute of Health, National Library of Medicine, *Miscarriage*, http://www.nlm.nih.gov/medlineplus/ency/article/ 001488.htm ("Among women who know they are pregnant, the miscarriage rate is about 15-20%."). Determining whether there is a beating heart is a crucial component to ensuring that a woman receives quality care. For example, if more than seven weeks have passed since the last menstrual cycle ("LMC"), and there is no fetal heartbeat, then the unborn child is almost certainly naturally deceased—although a pregnancy test will continue to generate a positive result. In that situation, the woman must be fully informed about whether an abortion is still necessary because state-subsidized private health insurance and Medicaid—which in most cases do not cover an abortion—will generally cover the procedure for removing the remains. *See* Wis. Stat. Ann. § 632.8985 (prohibiting coverage of abortions by health plans offered through health benefit exchanges); Wis. Stat. Ann. § 20.927 (prohibiting state or municipal subsidies for the performance of abortions).

[6] Wisconsin may also hope that a woman who sees the ultrasound picture of her unborn child and hears the heart beating will choose to carry the unborn child to term. But because the ultrasound requirement is not challenged in this case, Wisconsin does not assert its legitimate interest in

(continued...)

ment are secured by the oversight function of the admitting-privileges requirement. Specifically, hospitals extending admitting privileges are given a role in ensuring that the new requirements for the protection of women's health and choice are observed by abortion doctors—to prevent a substandard abortion care crisis in Wisconsin.

Additionally, many abortion-seeking patients face uniquely challenging circumstances not faced by other surgery patients. Many are young and vulnerable. Some may be pressured by angry, disappointed parents or by a putative father shirking responsibility. And, as the court remarks, there is wide-spread social disapproval of abortion. Maj. Op. at 7. So the woman is likely seeking absolute privacy and has had little or no external consultation or advice. A legislature could rationally speculate that a surgical procedure commonly undergone by young and vulnerable patients under the influence of either direct or social pressures is in greater need of regulation.

In summary, "[t]he State 'may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.'" *City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 430–31 (1983) (quoting *Roe v. Wade*, 410 U.S. 113, 163 (1973)). That is what Wisconsin has done in this case, and its decision to do so by means of an admitting-privileges requirement is certainly rational.

---

[6] (...continued)
fetal life here. *See Carhart*, 550 U.S. at 145 (recognizing "that the government has a legitimate and substantial interest in preserving and promoting fetal life" pre-viability).

**Step 2: Undue Burden**

The court also suggests that the admitting-privileges requirement imposes significant burdens on women's ability to obtain abortions. At this second step, we must determine "whether the [admitting privileges requirement has] the practical effect of imposing an undue burden" on women's abortion rights. *Karlin*, 188 F.3d at 481. We cannot find the requirement unconstitutional unless the plaintiffs can show that the requirement "will have the likely effect of preventing a significant number of women for whom the regulation is relevant from obtaining abortions." *Id.* In this case, because the requirement applies to all abortion doctors in the state, it affects all Wisconsin women who may seek abortions.[7] *See Abbott*, 734 F.3d at 414. Therefore, the question is whether the requirement prevents "a significant number of" women from obtaining abortions. At this step too, the plaintiffs have the burden of proof. *See Karlin*, 188 F.3d at 485; *Bryant*, 222 F.3d at 171.

In suggesting that Wisconsin's admitting-privileges requirement imposes an undue burden, the court emphasizes that it will temporarily force two abortion clinics to stop providing abortions and another clinic to cut the number of doctors by half, which could cause delays for women seeking abortions. Of course, this effect will only last until the doctors at these clinics obtain admitting privileges in accordance with

---

[7] Thus, the district court erred because it limited its review to women living in the areas near the clinics that may be closed.

the law.[8] Regardless, more than 70% of women in Wisconsin who seek abortions live in the southern counties near Milwaukee and Madison, where clinics will continue operating. *See* J.A. 292. Thus, to the extent the remaining clinics are unable to quickly adjust for the decreased supply of legally qualified abortion doctors, most Wisconsin women seeking abortions can travel to clinics in Illinois. Indeed, women living in the northern part of Wisconsin can seek abortions in Minnesota. For example, both Minneapolis and Duluth have abortion clinics.[9] Thus, the admitting-privileges requirement itself will likely not prevent any woman from obtaining an abortion if she wishes to do so. *See Bryant*, 222 F.3d at 163, 170–72 (holding that "increased costs, delays in the ability to obtain abortions, decreased availability of abortion clinics, [and] increased distances to travel to clinics" do not constitute an undue burden). Any delays are merely the incidental effects of

---

[8]  The undue burden analysis is not concerned with any burden the law may place on abortion doctors, except insofar as the law burdens women's ability to obtain abortions. Any burden on women will vanish once abortion doctors obtain admitting privileges.

[9]  The district court thought that the availability of abortions in cities near the Wisconsin border was irrelevant. Although the Wisconsin law does not affect doctors performing abortions in Minnesota, the availability of near-but-out-of-state abortions at least speaks to whether the admitting-privileges requirement has the "practical effect" of preventing a "significant number" of women from obtaining abortions. In our economy, crossing state lines to obtain services at a nearby urban center is common. Thus, state lines are unlikely to affect a woman's decision about where to get an abortion and the availability of abortion at out-of-state clinics should be considered in the undue burden analysis.

abortion doctors' obligation to come into compliance with the admitting-privileges requirement. The fact that the requirement "has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Casey*, 505 U.S. at 874. And here, we are affirming the district court's decision to give abortion doctors a reasonable amount of time to obtain admitting privileges.[10]

The court is also concerned by the fact that (because of Wisconsin's 24-hour waiting law) some Wisconsin women live around 100 miles from the closest abortion clinic—namely, those living in north-eastern Wisconsin—and consequently, will have to traverse that distance four times to obtain abortions (if they cannot afford to spend the night at a local hotel).[11]

---

[10] Now that some months have passed, Wisconsin abortion doctors have had sufficient time to come into compliance with the admitting-privileges requirement. The court suggests that disapproval for abortion may interfere with abortion doctors' abilities to obtain admitting privileges at sectarian hospitals. Maj. Op. at 10–11. However, "Lutheran and Jewish hospitals in Milwaukee allow abortions." J.A. 185, ¶ 13 (Decl. of Dr. James G. Linn). Furthermore, "[w]hile Catholic hospitals do not permit abortions to be performed at their facilities, they do allow abortion providers staff membership." *Id.* ("I know for a fact that Catholic hospitals in Milwaukee have or have had abortion providers on their medical staffs."). Although federal law prohibits sectarian hospitals from discriminating against abortion doctors when awarding admitting privileges, it seems reasonable that—in light of Catholic social teaching—Catholic hospitals would wish to grant admitting privileges to abortion doctors so that women injured by abortions would have better access to the compassionate medical care needed in that delicate circumstance.

[11] The number of women who seek abortions living in the areas near the

(continued...)

The court suggests that the time and costs of that travel will prevent a "significant number" of Wisconsin women from obtaining abortions. But the costs of traveling up to 100 miles on four different occasions pale in comparison to the cost of an abortion. The costs of travel are undoubtedly inconvenient, but an inconvenience—even a "severe inconvenience"—"is not an undue burden." *Karlin*, 188 F.3d at 481; *see also Casey*, 505 U.S. at 874 ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it."); *Bryant*, 222 F.3d at 163, 170–72.

Moreover, in reversing a district court's decision to preliminarily enjoin Texas's admitting-privileges requirement, the Fifth Circuit recently held that "[a]n increase in travel distance of less than 150 miles for some women is not an undue burden on abortion rights." *Abbott*, 734 F.3d at 415. Texas also imposes a 24-hour waiting requirement (which applies to any woman who lives within 100 miles of the clinic). *See* Tex. Health & Safety Code § 171.012(a)(4). Thus, under *Abbott*, Texas women could face an increase in travel distance of almost 400 miles. If an *increase* in travel distance of almost 400 miles is not an undue burden, it is difficult to see how a *total* travel distance of

---

[11] (...continued)
closed clinics is apparently very small compared to those living near the clinics that will continue to operate. Thus, the admitting-privileges requirement likely only will compel a few rural women to drive longer distances. So it is far from clear that a "significant number" of women will be prevented from obtaining abortions.

about 400 miles could be. *See also Bryant*, 222 F.3d at 170–71 (finding that admitting-privileges requirement imposed no undue burden where, *inter alia,* an abortion clinic was still operating "some 70 miles away"); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 605 (6th Cir. 2006) (concluding, in an as-applied challenge to abortion regulation, that an increase in travel distance of 45 to 55 miles is not an undue burden).

In summary, the plaintiffs "have not demonstrated that the [admitting-privileges requirement] would be unconstitutional in a large fraction of relevant cases." *Carhart*, 550 U.S. at 167-68. The other circuits to address this issue have reached the same conclusion. *See Abbott*, 734 F.3d at 416, 419; *Bryant*, 222 F.3d at 159, 173.

## Conclusion

The decision to have an abortion is, for many women, "the most difficult decision they will ever make." Lizz Winstead, *Abortion Is a Medical Procedure*, The Huffington Post, Nov. 11, 2012, http://www.huffingtonpost.com/lizz-winstead/abortion-is-a-medical-procedure_b_2064176.html. Therefore, when a woman enters an abortion clinic, she has a right to expect excellent care from a qualified doctor. One key component of quality care is the use of an ultrasound, which furnishes the abortion doctor with important and easily determinable facts about the pregnancy related to the woman's health and exercise of her free choice. For example, an ultrasound allows a determination of whether there is a fetal heartbeat, the gestational age and size of the unborn child, and whether there

are twins.[12] An ultrasound is also material to the costs of the procedure inasmuch as it may reveal that an abortion is no longer necessary (if the unborn child is no longer alive) and because clinics base the cost of the abortion procedure on the unborn child's gestational age.

The admitting-privileges requirement has an indisputable benefit when emergency care is needed. If serious complications arise, then the woman should be able to call her clinic and speak with the doctor who treated her. If that physician has admitting privileges, he or she can direct the woman to the hospital and meet her there, or at least contact the hospital and notify the proper admitting personnel to describe the possible causes of the woman's symptoms. Then, upon arrival at the hospital, the woman would be able to receive immediate care. And, if necessary, the hospital's doctor could contact the abortion doctor to confidentially obtain further details. Indeed, by requiring abortion doctors to commit to continued care, the admitting-privileges requirement prevents a situation where a hospital doctor is not fully aware of medical concerns because the patient does not wish to disclose that she had an abortion. Relatedly, the ability to obtain any followup care from same doctor furthers a patient's interest in privacy—a significant concern given the social stigma associated with abortion. Moreover, the admitting-privileges requirement furthers the state's interest in preventing crises of substandard

---

[12]   If the ultrasound reveals twins, this result may cause a woman to reconsider or at least reflect on an unexpected circumstance. In either case, the ultrasound furthers her health and ability to make a fully informed decision.

care. By entrusting hospitals with an oversight function, the requirement guards against worst-case scenarios.

The notion that abortion doctors will be unable to obtain admitting privileges is a fiction. Some already have them.[13] Even sectarian hospitals, apart from their legal duties, are interested in providing compassionate care to women who need it. Some hospitals may not allow elective or discretionary abortions to be performed on their premises, but even these hospitals have every reason to grant admitting privileges to abortion doctors in order to ensure that women in need receive adequate—as well as compassionate—medical care.

At trial, testimony from a technician who routinely performs ultrasounds on pregnant women—those who anticipate and look forward to having a baby as well as those who are considering terminating an unwanted pregnancy—would be beneficial. A neutral technician could explain the value an ultrasound provides for women's health in order to further illustrate the oversight benefit of the admitting-privileges requirement.

---

[13] According to the plaintiffs, Planned Parenthood's Milwaukee-Jackson clinic would be able to remain open even if the admitting-privileges requirement went into effect. Thus, at least one abortion doctor at that clinic must have admitting privileges at a nearby hospital. But Affiliated Medical Services' clinic, which will allegedly close for lack of abortion doctors with admitting privileges, is only 1.3 miles away from Planned Parenthood's Milwaukee-Jackson clinic. So any claim that abortion doctors at AMS will be unable to obtain admitting privileges because of recalcitrant local hospitals is all but meritless.

Wisconsin's admitting-privileges requirement is rationally related to the State's legitimate interests and should not create an undue burden to Wisconsin women's right to abortion. But Wisconsin's failure to include a reasonable time for compliance merited a preliminary injunction. Therefore, I concur in part and concur in the judgment.

**Appendix to the Concurrence**

Dr. Soleiman Soli in Pennsylvania. *See* Mark Scolforo, *Two Abortion Clinics Closed After Reports*, The Washington Times, Mar. 10, 2011, http://www.washingtontimes.com/news/2011/ mar/10/2-abortion-clinics-closed-after-reports/ (two abortion clinics shut down when inspection revealed expired drugs, uncalibrated medical equipment, and untrained personnel; a network of abortion care providers described the clinics as "women exploiters" ).

Dr. Andrew Rutland in California. *See* C. Perkes, *Abortion Doctor Gives Up License Over Death*, Orange County Register, Jan. 25, 2011, http://www.ocregister.com/articles/rutland-285561-death-license.html (woman died where clinic "was not equipped to handle emergencies" and the abortion doctor "failed to recognize [an allergic] reaction, adequately attempt resuscitation or promptly call 911." The doctor had previously given up his license "after allegations of . . . scaring patients into unnecessary hysterectomies, botching surgeries, lying to patients, falsifying medical records, over-prescribing painkillers and having sex with a patient in his office.").

Dr. Albert Dworkin in Delaware. *See* Steven Ertelt, *Hearing: Delaware Abortionist Helped Kermit Gosnell Avoid Law,* LifeNews, Mar. 16, 2011, http://www.lifenews.com/2011/03/16/hearing-delaware-abortionist-helped-kermit-gosnell-avoid-law/ (doctor

complicit in Kermit Gosnell's violations has license suspended).

Dr. James Pendergraft in Florida. *See* Steven Ertelt, *Abortion Practitioner James Pendergraft Loses Florida License a Fourth Time*, LifeNews, Jan. 1, 2009, http://www.lifenews.com/2009/01/01/ state-5339/ (abortion doctor's license suspended for fourth time for entrusting drug administration to unlicensed employee, previous suspensions included a botched abortion that resulted in the unborn child being shoved into the abdominal cavity and requiring that the woman receive a hysterectomy).

The Gentilly Medical Clinic for Women and the Hope Medical Group for Women in Louisiana. *See* Steven Ertelt, *Abortion Business in Louisiana Loses License for Poor Health, Safety Standards*, LifeNews, Jan. 20, 2010, http://www.lifenews.com/ 2010/01/20/state-4743/ (clinic lost license for operating without trained nurse or proper drug license); P. J. Smith, *Louisiana Abortion Clinic Shut Down for Ignoring "Most Basic" Medical Practices*, LifeNews, Sep. 7, 2011, http://www.lifesitenews.com/ news/archive/ldn/2010/sep/10090707 (clinic's operations suspended for failing to observe "the most basic medical practices" including "provid[ing] women a physical examination prior to abortions" or "follow[ing] necessary protocols for the administration of anesthesia and monitoring their clients' vital signs").

Drs. Romeo Ferrer, George Shepard, Leroy Carhart, and Nicola Riley in Maryland. *See*, *respectively*, Steven Ertelt,

*Pro-Lifers Want Maryland Practitioner Disciplined, Killed Woman in Botched Abortion*, LifeNews, June 1, 2010, http://www.lifenews.com/2010/06/01/state-5145/ ("Board of Physician's Peer Reviewers concluded the woman's death resulted from Ferrer's failure to meet the standard of quality care in violation of state law."); Steven Ertelt, *Troubled Abortion Biz Sees Two Practitioners Lose Medical Licenses*, LifeNews, Sept. 3, 2010, http://www.lifenews.com/2010/09/03/state-5416/ (transfer of patient of botched abortion in a rental car to a clinic in another state leads to the discovery, and suspension, of two doctors circumventing state law); *Authorities: Woman Died from Abortion Complications,* June 12, 2013, http://www.usatoday.com/story/news/nation/2013/02/21/woman-late-term-abortion-bled-todeath/1935799/ (Dr. Carhart is under investigation for the death of Jennifer Morbelli, a 29 year-old school teacher who underwent a late-term abortion); The order is available at http://abortiondocs.org/wp-content/uploads/2013/05/Nicola-Riley-MD-Permanent-Revocation-May-6-2013.pdf (order permanently revoking Dr. Nicola Riley's medical license Maryland after she failed to call for emergency help for a critically injured abortion patient and transported her to the hospital in the backseat of a rental car).

Dr. Steven Brigham in Maryland, New Jersey, and Pennsylvania. *See N.J. Targets Abortion Doctor Steven Brigham's License*, Lehigh Valley Live, Sept. 9, 2010, http://www.lehighvalleylive.com/phillipsburg/index.ssf/2010/09/nj_targets_abortion_doctor_ste.html (New Jersey seeks to take doctor's license after Maryland already took his license for risky interstate abortion scheme).

Dr. Rapin Osathanondh in Massachusetts. *See* Denise Lavoie, *Doctor Gets 6 Months in Abortion Patient Death*, Associated Press, Sep. 14, 2010, http://www.msnbc.msn.com/id/ 39177186/ns/us_news-crime_and_courts/t/doctor-gets-months-abortion-patientdeath/ (doctor sentenced to six months in jail for involuntary manslaughter because "he failed to monitor [abortion patient] while she was under anesthesia, delayed calling emergency services when her heart stopped, and later lied to try to cover up his actions.").

Dr. Alberto Hodari in Michigan. *See Schuette Files Suit to Close Unlicensed Abortion Clinic*, Office of the Attorney General, State of Michigan, Mar. 29, 2011, http://www.michigan.gov/ag/ 0,4534,7-164--253426--,00.html (Michigan Attorney General sues to close abortion clinic for failing to comply with health and safety rules applicable to surgical outpatient facilities).

Drs. Salomon Epstein and Robert Hosty in New York. *See* Steven Ertelt, *Practitioner Denies He Botched Legal Abortion That Killed Hispanic Woman*, LifeNews, Mar. 1, 2010, http:// www.lifenews.com/2010/03/01/state-4858/ (New York police investigate doctor after 37-year-old patient dies in botched abortion); http://operationrescue.org/pdfs/Hosty%20 revocation.pdf (eventually, responsibility for the death Dr. Epstein was investigated for was attributed to another doctor at the clinic, Dr. Hosty, whose license was revoked in this order); Southwestern Women' Options in New Mexico, *see* Jeremy Kryn, *New 911 Call from New Mexico Abortion Clinic Exposes Pattern of Emergencies*, LifeNews, Oct. 20, 2011, http://

www.lifesitenews.com/news/new-911-call-from-new-mexico-abortion-clinic-exposes-pattern-of-emergencies ("A recording of a 911 call . . . highlights the continuing danger [at] an Albuquerque abortion clinic . . . . The call is the eleventh emergency call [from the clinic] in less than two years . . . ." it was transcribed as follows, "'Uh, we have a 31-year-old female who underwent an abortion today. She's continuing to bleed. We need to transfer her to the hospital, please' . . . . 'The bleeding is persistent. It will not stop.'").

Dr. Tami Lynn Holst Thorndike in North Dakota. *See* Denise Burke, *North Dakota Abortionist Practices With Expired License*, Americans United for Life, Nov. 8, 2010, http://www.aul.org/2010/11/north-dakota-abortionist-practices-with-expired-license/ ("[A] North Dakota abortionist is being investigated for practicing with an expired license.").

Drs. Robert E. Hanson Jr., Margaret Kini, Douglas Karpen, Pedro J. Kowalyszyn, Sherwood C. Lynn Jr., Alan Molson, Robert L. Prince, H. Brook Randal, Franz Theard, and William W. West, Jr. of Whole Women' Health in Texas. *See* Steven Ertelt, *Tenth Texas Abortion Practitioner Under State Investigation*, LifeNews, Aug. 24, 2011, http://www.lifenews.com/2011/08/24/tenth-texas-abortion-practitioner-under-state-investigation/ (abortion center investigated for "illegal dumping of patient records and medical waste").

Dr. Thomas Walter Tucker II in Alabama and Mississippi. *See Abortion Doctor Suspended for Improper Drug Storage*, Orlando Sentinel, Apr. 24, 1994, http://articles.orlandosentinel. com/1994-04-24/news/9404240462_1_abortion-doctor-tucker -licensing (Dr. Tucker lost his medical license for drug-storage violations, and was subsequently found liable for $10 million in a medical malpractice case involving the death of an abortion patient. *See Former Abortion Doctor Ordered to Pay $10 Million*, Sun Herald, Dec. 8, 1996, 1996 WLNR 256209).

Dr. Mi Yong Kim in New York and Virginia. *See* Operation Rescue, *Troubled Virginia Abortion Clinic Puts Bleeding Botched Abortion Patient in Hospital,* LifeSiteNews, Apr. 20, 2012, http:// www.lifesitenews.com/news/troubled-virginia-abortion-clinic-puts-bleeding-botched-abortion-patient-in/ (patient put in hospital after abortion at clinic run by a doctor whose license had been surrendered. The surrender order available at http:// abortiondocs.org/wp-content/uploads/2012/04/Kim-VA-License-Surrender05182007.pdf.).